ORDER OF UNITED COMMERCIAL TRAVELERS v. SIMPSON. (No. 7254.)†

(Court of Civil Appeals of Texas. Dallas. May 1, 1915. Rehearing Denied June 5, 1915.)

1. INSURANCE ⬦⟳665 — ACCIDENT INSURANCE —ACTIONS—EVIDENCE.

In an action on an accident policy, evidence *held* to warrant a finding that deceased met his death through an accident contemplated by the terms of the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. ⬦⟳665.]

2. INSURANCE ⬦⟳668 — ACCIDENT POLICY — ACTIONS—QUESTION FOR JURY.

In an action on an accident policy, the question of the cause of death is for the jury, where no one witnessed it.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. ⬦⟳668.]

3. INSURANCE ⬦⟳297—ACCIDENT INSURANCE —REPRESENTATIONS.

A statement by insured as to his habits with reference to intoxicants must be construed as to his habits at the time of the application, not before or after.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 676; Dec. Dig. ⬦⟳297.]

4. INSURANCE ⬦⟳665—ACCIDENT INSURANCE —ACTIONS—EVIDENCE.

In a suit on an accident policy, evidence *held* to warrant a finding that insured's statement that he did not use intoxicating liquors was not a misrepresentation.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. ⬦⟳665.]

5. INSURANCE ⬦⟳390 — ACCIDENT INSURANCE —DEFENSES.

Under the direct provisions of Vernon's Sayles' Ann. Civ. St. 1914, art. 4948, an insurance company cannot defend on the ground of misrepresentations, where it did not, within 90 days after discovering the falsity of the representations, give notice to plaintiff.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1037, 1038; Dec. Dig. ⬦⟳390.]

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by Bessie Simpson against the Order of United Commercial Travelers. From judgment for plaintiff, defendant appeals. Affirmed.

---

⬦⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

Harry L. Doud, of Columbus, Ohio, and Seay & Seay and Smith, Robertson & Robertson, all of Dallas, for appellant. John L. Young and Thompson, Knight, Baker & Harris, all of Dallas, for appellee.

TALBOT, J. The appellee, Mrs. Bessie Simpson, brought this suit as the beneficiary in an accident policy issued by the appellant to her deceased husband, John H. Simpson, to recover the sum of $5,000, the face value of said policy, together with statutory penalty of 12 per cent. legal interest, and attorney's fees. The pleadings setting forth the appellee's alleged cause of action and the appellant's defenses are full, and their sufficiency not questioned on this appeal. The case was submitted to a jury on special issues, and upon their findings the court rendered judgment in favor of the plaintiff for the sum of $6,583, the principal and interest of the policy, and in favor of the appellant on the claim for penalty and attorney's fees. From the judgment so rendered in favor of the appellee, the appellant prosecutes this appeal.

The appellant, under the contract sued on, was liable only in the event the insured, "through external, violent and accidental means," received an injury, "which alone and independent of all other causes" occasioned his "death immediately or within six months from the happening thereof," and the central question presented for our determination by appellant's assignments of error is whether the facts and circumstances in evidence, no one having witnessed his death, were sufficient to take the case to the jury and justify their findings, and the judgment based thereon, to the effect that the death of the deceased, John H. Simpson, was the result solely of an accident as contemplated by the terms of the policy. The theory of the appellee is "that the deceased slipped and fell, dislocating his neck and rupturing a blood vessel in some part of his head, causing him to bleed from a pint to a quart of blood, thereby producing his death," whilst that of appellant is "that the deceased came to his death from heart failure brought about by alcoholic poison," and, further, "that the evidence is sufficient to show how the deceased came to his death, and that it is but a conjecture, a guess, a supposition unsupported by evidence, to say that he slipped and fell and received injuries resulting in his death."

[1, 2] The evidence upon which a decision of the question turns is conflicting in some material particulars, but sufficient to warrant the following conclusions of fact: The deceased, for several days prior to his death, had been staying at the St. George Hotel in the city of Dallas. In connection with the room he occupied there was a bath and toilet room. This bath and toilet room was about three feet wide and about four or five feet long, and in it was located a commode and shower bath. The back of the commode was practically against, or very near, the rear wall of the room; its right side was a little distance from one of the side walls; its front was about three feet, or probably a little more, from the front wall, and the shower bath was to the left of the commode, and between the commode and the other side wall of the room. Above the commode and attached to the side wall of the room was a toilet paper rack. The floor of the room was composed of what is called terazza, a substance smoother and slicker than tile. The deceased was in the bathroom at the time of his death, and had just prior thereto been using the commode. The shower bath in the room at the time was defective, and water leaking or thrown therefrom caused the floor to be wet and very slick. The deceased sometimes drank intoxicating liquors to excess, and had on more than one occasion been treated at sanatoriums for acute alcoholism. He had been at the St. George Hotel in Dallas 10 or 12 days immediately preceding his death, and for several days during this time he was under the care of a physician and nurse, sobering up from a drunk. While being so cared for his nurse became alarmed at the weak condition of his pulse and telephoned to the physician treating him his condition, and asked him what he should do. The physician advised the giving of heart stimulants, which was done, and the practically normal action of the heart and pulse was thereby restored. On the eighth day of the treatment of the deceased the attending physician discharged him as being sober and well, and for four days immediately preceding his death the deceased had been sober. The deceased was about 5 feet and 8 inches tall and weighed about 140 pounds. On the morning of the 12th day of December, 1912, the body of the deceased was found in the bath and toilet room. He had evidently died some time during the previous night. He was in his underclothes and barefooted. He was lying on his face and head, with the palm of one hand upon the floor, as it would probably have been had he attempted to catch himself to prevent falling. His body was in an arched or oval position. His head was against the front wall of the bathroom and in the corner formed by that wall and the wall on the right side. One foot was back against the rear wall between the commode and the wall of the room, as it probably would have been had he slipped and fallen in attempting to rise from the commode. His other foot was against the bottom of the front of the commode, but no other part of his body touched it. His face was bruised and mashed, and he had bled through his nose from a pint to a quart of blood. The bleeding indicated that his heart was beating after his fall, and the heart of a man dying from a dislocated neck would probably beat about one minute after receiving such an injury. The deceased's neck was broken at the point where the atlas and axis

join. Such a break or dislocation could be produced only by a "sudden hard fall." If the deceased had died of heart failure, he would probably have sank gradually down, and would not, in all probability, have attempted to catch himself with his hands. There would not, in all probability, be sufficient violence from a fall occasioned by heart failure to have produced and brought about the dislocation of the deceased's neck. An autopsy, performed on the body of the deceased five or six months after his death and burial by several physicians, revealed, according to their testimony, "some diseased elements" in the heart, lungs, and brain, which, in their opinion, was the result of alcoholic poison and caused his death. There was other substantial testimony, however, which justifies the conclusion that the condition of the deceased's heart, lungs, and brain, as disclosed by the autopsy, could have been produced by a violent fall which dislocated his neck and caused him to bleed from a pint to a quart of blood; that the condition found in the lungs of the deceased was just such a condition as might be expected to be found in the case of a man who had died as a result of a dislocated neck; that disease of the arterial system usually accompanies death from heart trouble, and that the arterial system of the deceased was not diseased; that there were no adhesions between the heart and the membranes around the pericardium, and that this indicated there was nothing wrong with that part of the heart.

The jury found, in response to issues submitted to them, that the death of the deceased was not due to heart failure produced by disease, nor to a diseased condition surrounding the heart; that on or about the 12th day of December, 1912, the deceased suffered a bodily injury which left visible marks of said injury upon his body; that he accidentally slipped and fell and dislocated his neck, and that his death was caused by such fall, and the injuries sustained thereby, independently of all other causes. These findings of the jury are to the effect that John H. Simpson's death was the result of bodily injuries received through external, violent, and accidental means, which, independently of all other causes, occasioned his death, and if they find support in the evidence the liability of the appellant, under the terms of its policy, is thereby established and the judgment rendered in favor of the appellee should not be disturbed, unless a reversal is made necessary on some ground urged other than the insufficiency of the evidence. For it is the well-settled rule of practice in this state, and in many other jurisdictions for that matter, that when the evidence is sufficient to authorize the submission of a given issue to the jury, their determination of it is binding upon the appellate court. The fact that the appellate court, sitting as a jury, might, upon the same evidence, reach a conclusion different from that reached by the jury does not change the rule. That the evidence bearing upon the issue here in question was of the character just referred to can hardly be denied. No one witnessed the death of the deceased, but its cause was a question of fact to be determined from all the relevant facts and circumstances disclosed by the evidence, and these facts and circumstances were clearly sufficient to show, and justify the jury's conclusion, that he died as the result of an accidental fall which produced a dislocation of his neck. United Commercial Travelers v. Roth, 159 S. W. 176; Larkin v. Interstate Casualty Co., 43 App. Div. 365, 60 N. Y. Supp. 205; Maryland Casualty Co. v. Burns, 149 Ky. 550, 149 S. W. 867; Preferred Accident Ins. Co. v. Barker, 93 Fed. 159, 35 C. C. A. 250. As well said in the last case cited:

"In this case, as in many others, where the body of insured is found, and no one has witnessed the death, the circumstances and surroundings are the only evidence that can be produced to determine the cause. * * * Such facts must be submitted to the jury for their consideration, and their finding thereon is final."

Touching the issue of whether or not the deceased's neck was broken, two physicians and surgeons, sent, it seems, by the local secretary of the appellant to view the body, testified that they could take the head and place it against the back between the scapulæ; that they could lay the ear on the apex of either shoulder; that the head when raised from its resting place and released would fall loosely about; that they examined the vertebræ as far down as the shoulder; that there was a separation of the vertebræ or bones at the point where the atlas and axis join; that they could lay two of their fingers in the opening created by the separation of the atlas and axis; and that a dislocation there was easily detected. To the same effect on this issue is the testimony of the justice of the peace, who held a coroner's inquest over the body of the deceased, and two of the undertaker's assistants, who embalmed and prepared the body for burial. In conflict with this testimony is the testimony of the physicians who performed the autopsy five or six months after the death of the deceased. Their testimony is to the effect that in the post mortem examination made by them no dislocation of the deceased's neck was found, and that in their opinion his neck had not been broken. As tending to show that these physicians were mistaken in their conclusion that the neck of the deceased had not been dislocated, appellee introduced the testimony of the undertaker's assistants, who handled and prepared the deceased's body for burial, to the effect— "that before embalming a body they always attempted to reduce and correct any dislocation or abnormality, and that they did in this instance reduce the dislocation and place the vertebræ of the deceased's neck in their proper alignment before embalming it; that the em-

balming fluid used had the effect of hardening the parts and holding them in any relation in which they were placed prior to the process of embalming."

There was also testimony in this connection by the physician sent by the secretary of the appellant to examine the body of the deceased, to the effect that he found the neck in alignment; that he easily and readily took it out of alignment and determined the injury, and thereafter placed it back, as nearly as possible, in perfect alignment. It is further very plausibly claimed by the appellee that the testimony of the physicians who performed the autopsy could reasonably be discarded by the jury as unsatisfactory, because of their varying statements in relation to the same matters about which they were interrogated. Indeed, it is pointed out by her counsel that one of them testified that neither he nor any other physician could determine what caused the heart to fail, what was back of its failure; that if it were assumed as a fact that the man had suffered a dislocated neck, that would be sufficient to have produced the failure of the heart. Another of the expert physicians testified with equal confidence that the deceased died of heart failure, and that he knew and could tell from an examination of the heart alone that the heart failure was the initial, sole, and only cause of his death. Another introduced by the appellant testified· that he did not know and could not tell that the man died of heart failure, and did not know that he so died, while another, to wit, Dr. Black, testified that after the autopsy was complete he did not know and could not tell what caused his death, his testimony in exact language being as follows: "I do not know why he died, or how he died, or what caused his death." One of the expert physicians testified that there was a tearing of the brain tissue and ·its lining; that this indicated and conclusively established as true that the party had been addicted to the excessive use of alcoholic liquors for many years; that it could not come from any other cause or condition; another testified with equal confidence that the condition was normal; another testified that it indicated no appreciable deviation from normal; while still another testified that such condition could have been produced by violent trauma. Dr. Terrell, one of the expert physicians of appellant, testified, among other things, that:

"A man dying of heart trouble, we do find, as a rule, gross disease of the arterial system. We did not find such disease in this case. * * * Probably half of the men of 42 who have lived an active life would show something abnormal in the heart. That there was nothing about the heart from which he could tell whether the fall preceded the failure of the heart or not. * * * If I assume as a fact that the deceased had fallen on the hard floor, receiving a dislocation of the neck, a hemorrhage of a pint of blood would be sufficient to cause death. That would be a very natural explanation of it if he had a dislocation of the neck. * * * ·There were no adhesions between the heart

and the membranes around the pericardium which indicated that there was nothing wrong with that part of the heart; that the heart was not diseased to that extent. * * * The conditions found at the autopsy indicated that the heart did not stop all at once. * * * The conditions of the lungs showed that the heart did not collapse all at once; that it continued to beat probably as much as a minute. * * * In an ordinary accident which kills a man instantly the heart continues for probably a minute and just goes on and produces that condition found in the lungs of. the deceased. * * * When a man dies from a dislocated neck we would expect to find just the condition that he found there in the lungs of deceased. * * * If the deceased had died of heart failure he would just sink down, just gradually sink down. * * * It is doubtful whether he would endeavor to protect himself. * * * I would not expect an ordinary gradual sinking down to produce a dislocation, but would expect the fall to be hard and sudden."

On the other hand, the appellant's chief surgeon, Dr. Taylor, testified, among other things, that it would be impossible for a man to fall from a commode from heart failure and produce a dislocation of the neck; that it would be impossible to produce it from a fall of two or three feet; that there would not be sufficient force back of the fall if the fall was for two or three feet; that it would require extreme violence to produce the result. So that, looking to all the evidence given at the trial, and considering the inferences that the jury could legitimately and reasonably draw therefrom, we hold that it is sufficient to support the verdict rendered and the judgment based thereon. Although circumstantial, it did not, in our opinion, leave the determination of the issue as to the manner and cause of the deceased's death to mere speculation and conjecture. Nor was the jury forced, by the character of evidence introduced, to base presumption upon presumption in order to reach the conclusion that the circumstances surrounding the death of the deceased were consistent with and sufficient to establish the theory of the appellee that he died as a result of an accidental fall, which produced a dislocation of his neck.

[3, 4] In his application for membership in appellant's association the deceased, John H. Simpson, was asked the following question: "To what extent, if at all, do you use alcoholic liquors, morphine, cocaine, chloral or other narcotics?" To which he answered, "No," and the appellant contends that the trial court erred in refusing its special charge, directing the jury to return a verdict in its favor because the uncontroverted evidence shows that on numerous occasions prior to and subsequent to the making of said answer, the deceased, Simpson, had been intoxicated to an extent that endangered his life. The proposition urged is that in an—

"action where a policy of insurance is based upon the written application and the answers to the question in the application are warranted to be true, and if a question is answered falsely and the matter inquired about is shown to be material to the risk and actually contributed to

the contingency upon which the policy became liable, there is no liability upon the part of the defendant to pay a policy issued under such conditions, and a verdict and judgment rendered in favor of the plaintiff under such conditions are contrary to the law and the evidence, and should be set aside."

We do not think this proposition should be sustained. In their findings upon special issues submitted to them the jury answered: (1) That the deceased made no false statement or misrepresentation in his application for membership in appellant's order in regard to the extent of his use of alcoholic liquors; (2) that a misrepresentation by the said Simpson, if any, was not material to the risk, and did not contribute thereto; and (3) that appellant did not notify appellee of such defense within 90 days after its discovery. These findings of the jury, especially the first and third, were warranted by the evidence, and either was sufficient to defeat the defense to which it related. We agree with the view expressed by appellee that the question and answer referred to must be construed as having reference to the habit and custom of the deceased, Simpson, at the time he signed the application for membership in appellant's association, in regard to his use of intoxicating liquors. National Fraternity v. Karnes, 24 Tex. Civ. App. 607, 60 S. W. 576; Northwestern Mutual Life Ins. Co. v. Bank, 122 U. S. 501, 7 Sup. Ct. 1221, 30 L. Ed. 1100; Columbia Life Ins. Co. v. Tousey, 152 Ky. 447, 153 S. W. 769; Insurance Co. v. Foley, 105 U. S. 350, 26 L. Ed. 1055. So construed, there was no misrepresentation of the extent of his use of intoxicating liquors. The proof showed that in the spring preceding the application in December, 1911, the deceased was in a drunken spree upon two occasions, and that upon one occasion in the year 1909 or 1910, he was under the influence of intoxicating liquors. The wife of the deceased testified very clearly and positively to the effect that from the spring of 1911 until the spring of 1912 he never drank, and that she never had a physician with him on that account during such period; that she had Dr. Grigsby with him upon one occasion in the spring of 1912, and Dr. Swain upon one occasion in the spring of 1912; that Dr. Grigsby attended the deceased upon one other occasion, but that he attended him for biliousness, and not for drink; that she had Dr. Clay with him twice in the fall of 1912, and that she called a physician every time he began to drink, in order to stop his drinking. This testimony, in the main, was corroborated by a number of other witnesses, who were intimate friends and associates of the deceased, all of them testifying that they were with him upon frequent occasions; that they never knew of his drinking; that they never saw or heard of his being under the influence of liquor; some of them testifying that he had, upon occasion, declined to

drink with them, stating that he did not drink. Dr. Clay testified in this connection as follows:

"His history was that he occasionally drank. He told me that he did not really care for the taste of liquor, but that he had insomnia, and he got to where he could not sleep. He knew that whisky would make him sleep, and that nothing else seemed to, and that he would start to taking a drink to get rest, and the first thing he knew he would be drunk."

From this testimony the jury was authorized to find, as they did, that the deceased made no misrepresentation of fact in the answer under consideration.

[5] Again, article 4948 of Vernon's Civil Statutes provides that in—

"all suits brought upon insurance contracts or policies hereafter issued or contracted for in this state, no defense based upon misrepresentations made in the applications for, or in obtaining or securing the said contract, shall be valid, unless the defendant shall show on the trial that, within a reasonable time after discovering the falsity of the misrepresentations so made, it gave notice to the assured, if living, or, if dead, to the owners or beneficiaries of said contract, that it refused to be bound by the contract or policy; provided, that ninety days shall be a reasonable time."

Failure to give the notice within the time here prescribed absolutely bars the insurance company from defending an action on the policy because of alleged misrepresentations (National Life Ass'n v. Hagelstein, 156 S. W. 353); and, the jury having found, upon evidence warranting it, that appellant had failed to give such notice, it could not successfully defend this action on the ground that the deceased had misrepresented in his application for membership in its order the extent to which he used intoxicating liquors.

Believing the assignments disclose no reversible error, the judgment of the court below is affirmed.