**TRAVELERS' INS. CO. v. CULPEPPER**

· et al.

**No. 2744.**

Court of Civil Appeals of Texas. Beaumont.

May 11, 1935.

Rehearing Denied May 15, 1935.

Pipkin & Pipkin, of Beaumont, for appellant.

Howth, Adams & Hart, of Beaumont, and Shivers & Shivers, of Port Arthur, for appellees.

COMBS, Justice.

This is a compensation case. H. M. Culpepper was the injured employee; Goodhue Hotel Company was the employer; and appellant, Travelers' Insurance Company, was the compensation insurance carrier.

On April 18, 1931, while on duty as an engineer in the hotel operated by the employer, in the city of Port Arthur, H. M. Culpepper sustained a fractured skull as the result of a dispute with one Eddie Boyd, a fellow employee. He died August 30, 1932, some seventeen months after the injury, allegedly as the result of said injury. After his injury Culpepper made claim and filed suit for compensation, which suit was pending at the time of his death. The widow and her three minor children renewed the claim before the Industrial Accident Board as a death claim and, upon an adverse ruling being made by the board, filed suit. Also two minor children of Culpepper by a former marriage made claim and filed suit for a share of the compensation. The three suits thus begun were consolidated.

Appellant denied liability upon two theories: First, that Culpepper's injury was not received in the course of his employment, but resulted from a personal difficulty with one Eddie Boyd, which difficulty did not arise out of and was in no way connected with the employment; and, second, that Culpepper's death did not result from the injury but resulted solely from disease.

A trial to a jury resulted in findings to the effect: (a) That deceased received his injury in the course of his employment; (b) that said injury was the producing cause of his death; (c) that his death was not due solely to natural causes or disease; (d) that the injury sustained by Culpepper was not caused by the act of Eddie Boyd intended to injure him because of reasons personal to said Culpepper and not directed against him as an employee or because of the employment; and (e) that the injury to Culpepper was not caused by willful intention and attempt of said Culpepper to injure Eddie Boyd. Other findings were made which entitled the claimants to lump-sum payment. Appellant has prosecuted this appeal from an adverse judgment upon the findings.

Appellant's twenty-two propositions present but two controlling questions; these being, as above mentioned, whether the evidence is sufficient to sustain the jury's finding that Culpepper received his injury in

the course of his employment, and whether the evidence sustained the jury's findings that death resulted from the injury.

On the issue that deceased, at the time of his injury, had turned aside from his employment, and was aggressively engaged in a personal difficulty with Eddie Boyd, the pertinent facts are: Culpepper was employed as engineer in the Goodhue Hotel, his duty being to make repairs of the machinery, plumbing, and other equipment. He roomed at the hotel and was subject to call at all hours when needed. It was his custom to call at the linen room on the second floor of the hotel every hour or two during the day and pick up the written reports of the needed repairs left there by room supervisors and other employees, it appearing that it was the custom for such reports to be left with the linen room employees. On the occasion of his injury he called at the linen room as usual. Mrs. L. McFarland, housekeeper, and Mrs. J. M. Casseux, linen room girl, were in the room at the time. Shortly after Culpepper arrived, Eddie Boyd, a negro waiter, came into the room to sharpen some pencils on a sharpener which was fastened to a table near the door of the room; he having been sent there for such purpose by Fred Williams, headwaiter, under whom he worked. Williams and several other negro waiters were in the dining room, which was on the same floor but some thirty feet or more distant down a hallway. According to Mrs. Casseux, she and Mrs. McFarland needed a pencil and asked Boyd for one, but he refused to give them one, saying they belonged to Fred Williams and were going to be used at a banquet on the roof. She testified in that connection that she and Mrs. McFarland used pencils in their work; that sometimes Mr. Culpepper furnished them pencils and sometimes they got pencils elsewhere. After the request for the pencil and Boyd's refusal to give them one, Mr. Culpepper reached over and picked one up and gave it to Mrs. McFarland, saying to Boyd, "I will make it all right with Fred." Boyd objected and an argument ensued. Boyd continued to demand the pencil and became angry, Culpepper several times stating, "I will make it all right with Fred." Mrs. McFarland, seeing that trouble might develop, left the room and went to the dining room to report the affair to Fred Williams. After she left, Culpepper and Boyd continued to argue about the pencil for a minute or two and then left together, going in the direction of the dining room. Mrs. McFarland, apparently having finished her report to Williams, left the dining room and returned to the linen room. As she left she met Boyd and Culpepper at the door coming into the dining room where Fred Williams was.

As to what took place after Culpepper and Boyd reached the dining room, we have the testimony of only two eyewitnesses, Caffery Arvan and Steve Shepherd, waiters. The headwaiter, Fred Williams, seems to have gone to parts unknown. Eddie Boyd, being under indictment for the murder of Culpepper, declined to testify as to how Culpepper received his injury. However, his testimony on a former trial as to the events leading up to the injury was reproduced. Three other waiters who were in the room were not produced as witnesses.

According to Arvan, Eddie Boyd and Mr. Culpepper came into the dining room together, Culpepper walking behind Boyd, and they were quarreling about the pencils. He testified that Culpepper cursed Boyd and threatened to knock his brains out, and that Boyd said, "You aint going to do nothing." Whereupon Culpepper raised a hammer to hit Boyd, and Boyd ran into him and butted him on the chin; and that Culpepper fell backwards, striking the back of his head on the floor. Steve Shepherd's version of the affair was to the effect that when Culpepper and Boyd came into the dining room where Fred Williams was, Culpepper asked Fred Williams what he had told Boyd about the pencils, and Fred said he had told him to bring them back and not give them away as he had been doing; that Culpepper told Eddie (Boyd) he knew he (Boyd) couldn't be running the place when he was only working there; that some words were exchanged between them when Culpepper "cussed" Eddie and picked up a hammer from the table with the remark, "I'll bust your brains out." Whereupon Boyd rushed into him and butted him down. This witness said he ran out of the room at that time and did not know what happened after that.

It is upon the above facts, largely, that the appellant urges its proposition to the effect that the evidence establishes, as a matter of law, that Culpepper had turned aside from his employment at the time of his injury and was aggressively engaged in a personal difficulty with Eddie Boyd. On the other hand, it is the theory of appellees that Boyd became angry with Culpepper over the pencil incident and struck him on the back of the head with a table leg or other blunt instrument; and that Culpepper did not turn aside from his employment by be-

coming the aggressor in a personal struggle with Boyd. Certain facts and circumstances in evidence tend to substantiate their theory. It is not disputed that the argument which began in the linen room arose over the pencil incident. There had been no previous trouble between Culpepper and Boyd, and it is undisputed that Culpepper was a man peaceably inclined and had had no previous trouble with Boyd or any other employee. Boyd, who is described in the testimony as a West Indian negro, became very angry with Culpepper. Mrs. Casseux, the linen room girl, who was present during the entire argument in the linen room, testified that Mr. Culpepper did not appear to be angry when he left the linen room but that Boyd was. In that connection she directly contradicts Boyd's testimony that Mr. Culpepper threw him out of the linen room, her testimony being that Culpepper did not throw him out and that the two left together. It appears that Culpepper went to the dining room to discuss the dispute with Fred Williams, the headwaiter under whom Boyd worked. It was Boyd's testimony that not a word was spoken between him and Mr. Culpepper from the time they left the linen room until they reached the dining room where Fred Williams was. The waiter Steve Shepherd testified that Culpepper explained the matter of the dispute over the pencil to Fred. Boyd's testimony also corroborates this statement, it being his version that Culpepper made a statement to Fred and that he (Boyd) then began telling Fred about it and Mr. Culpepper would not let him finish. The testimony of Shepherd that the injury to Culpepper's head was caused by a fall backward on the floor is flatly contradicted by the physical facts. The injury was a fracture of the back part of the skull, and the evidence of the physician and others is undisputed to the effect that the blow which produced the fracture made a depression in the skull as broad as two fingers. The attending physician, Dr. White, testified that the injury could not have been produced by a fall on the floor, but that it was produced by Culpepper being struck a blow by some blunt instrument such as a hammer handle or something of that kind. It is further shown that immediately after the trouble and within two or three minutes after Culpepper and Boyd left the linen room, Fred Williams came running into the linen room and told Mrs. Casseux and Mrs. McFarland that Eddie Boyd had hit Mr. Culpepper. Mrs. McFarland's version was that Williams said, "Eddie has knocked Mr. Cul-

pepper out." The two women went down to the dining room immediately, and Mr. Culpepper was sitting in a chair talking irrationally and the blood was running out of his ears and nose. It is undisputed that there were table legs lying loose in the room.

■ We understand it to be the rule that where an employee, for reasons personal to himself and not in furtherance of any duty owed his master, invites a personal encounter and willingly engages in it and is injured as a result thereof, he cannot recover. In such case it is apparent that the injury does not arise out of the employment but has its origin in matters lying wholly outside of the duties owed by the employee to the master. In Texas Indemnity Ins. Co. v. Dunlap (Tex. Civ. App.) 68 S.W.(2d) 664 (writ refused), this court recognized such rule. There the record, as the majority construed it, compelled the conclusion that the injured employee had turned aside from his employment and recovery was denied upon that theory. The controlling facts, which were uncontroverted, were that: First, the horseplay or struggle in which Dunlap received his injury arose over a practical joke played upon him by his fellow employee; and, second, Dunlap aggressively, or at least willingly, participated in such horseplay or struggle. Thus the injury arose out of a matter not connected with or in furtherance of any duty owed the employer. We refer to that opinion for a review of several leading authorities bearing upon the question.

■ But in the case before us the facts clearly distinguish it from those cases where our courts have denied recovery on the ground that the employee, at the time of his injury, had turned aside from his employment. Here the difficulty arose between two fellow employees over the method or manner of doing the work and at a time when they were engaged in the service of the common employer. Thus the injury originated in the work or business of the master, or in furtherance of its affairs. Boyd's anger toward Culpepper was directed toward him because of acts performed in his capacity as an employee. And the finding is amply supported that Culpepper was not, at the time of his injury, engaged in a willful intention or attempt to injure Boyd. Under all of the authorities an injury so received is compensable. Article 8309, Vernon's Ann. Civ. St.; McClure v. Georgia Casualty Co. (Tex. Com. App.) 251 S. W. 800; New Amsterdam Casualty Co. v. Collins (Tex. Civ. App.) 289 S. W. 701, 702; Cassell v. United States

Fidelity & Guaranty Co., 115 Tex. 371, 283 S. W. 127, 46 A. L. R. 1137.

The other point presented by appellant's propositions is the sufficiency of the evidence to support the jury's finding that Culpepper died as a result of his injury.

As above stated, Culpepper received a fracture of the back portion of the skull which produced a depression at the place of injury, but he did not die until some seventeen months later. At the time of the injury Culpepper was carried to the hospital, and after staying there for some time he seemed to get better for about two months. It is undisputed that he was never able to work after his injury. He made one or two attempts to go back to work but was unable to do so. Dr. White, the family physician, who treated Culpepper and who had been the family physician for some six years prior thereto, testified that before the injury Mr. Culpepper was a well and hearty man; that he was never well after his injury; that after he was out of the hospital he came to his office on numerous occasions; that he would talk irrationally, complained of blinding headaches and impaired vision, as well as dizziness and general weakness; that Mr. Culpepper frequently staggered when he would get up to walk out of his office. Some two or three days before his death he developed a high fever and was rushed to the hospital, where he died. An autopsy was performed by Dr. H. B. Williford, a pathologist. Dr. Williford testified that his findings were that Culpepper died as a result of pneumococcic meningitis; that the pneumonia germ which produced it was identified; and that the meninges and the tissues of the brain itself were affected. It was Dr. Williford's testimony that this infection was sufficient of itself to produce death and that it was unusual for one to recover from pneumococcic meningitis. He testified that the disease came from an infection; that the germ of pneumonia which produced it is frequently in the mouth, throat, and air passages of the human body; that the infection did not arise from the blow on the head for the reason that the blow did not break through. It was the opinion of Dr. Williford that Culpepper's death was not produced by the injury but by the pneumococcic infection. However, Dr. White testified that in his opinion Culpepper's death was **very** probably due to the trauma received to the brain, which months later developed the pneumococcic meningitis. It was his theory that there was an injury to the brain and a chronic irritation of the meninges at the point of the injury; that the weakened tissues at that point rendered them susceptible to the pneumococcic infection. He was asked:

"Q. Assuming that this man died of pneumococcic meningitis you wouldn't say would you that so far as any blow received on his head that that was a result of the blow, this pneumococcic infection being present? A. I would say in this way, that he had a chronic inflammation of the meninges, of long standing, and the pneumonia germ drifted along there and got to it, it might cause a pneumococcic meningitis."

We think the evidence fully warrants the jury's finding that the death of the deceased resulted from the injury. That the injury was a severe one and that the deceased was still suffering from it at the time of the onset of the high fever and resulting death seem evident. The testimony of Dr. Williford to the effect that the sole cause of Culpepper's death was pneumococcic meningitis, produced by an infectious germ, was itself opinion evidence to be weighed and passed upon by the jury in view of all the facts. For discussion of this proposition, see Metropolitan Life Ins. Co. v. Mrs. Katie L. Funderburk (Tex. Civ. App.) 81 S.W. (2d) 132, and authorities cited. Moreover, even if it be conceded that the immediate cause of death was the pneumococcic meningitis, still it is an inference fully warranted by the testimony that such infection was brought about or directly contributed to by the chronic inflammation of the meninges and covering of the brain, produced by the injury. The testimony of the family physician amply supports the inference that the infection and death would not have resulted but for the injury from which Culpepper was suffering. We think the findings that the injury was the producing cause of his death and that same was not due solely to natural causes have ample support in the evidence. Commercial Standard Ins. Co. v. Noack (Tex. Com. App.) 62 S.W.(2d) 72; Guinn v. Coates (Tex. Civ. App.) 67 S.W. (2d) 621; American Ins. Co. v. McKellar (Tex. Civ. App.) 295 S. W. 628.

Finding no error, the judgment of the trial court is in all things affirmed.