**PAN AMERICAN LIFE INSURANCE COMPANY et al., Appellants,**

v.

**Mrs. E. R. YOUNGBLOOD et al., Appellees.**

**No. 1129.**

Court of Civil Appeals of Texas, Tyler.

July 27, 1978.

Rehearing Denied Aug. 31, 1978.

A. D. Dyess, Jr., Jesse R. Pierce, Foreman, Dyess, Prewett, Rosenberg & Henderson, Houston, for appellants.

Dan Matthews, Fulbright & Jaworski, Houston, for appellees.

MOORE, Justice.

This is a suit by the beneficiaries to recover accidental death benefits under two insurance policies. Mrs. E. R. Youngblood, Mrs. H. M. Lindsey, Estey R. Youngblood, Lindsey S. Youngblood, Mrs. Joan Smith, and Newton C. Youngblood, plaintiffs, instituted suit against defendants, Pan American Life Insurance Company and Banker's Life & Casualty Company, to recover benefits under the accidental death coverage

provisions under the respective policies issued by defendants on the life of Benjamin Lindsey.[1] The defendants denied that the deceased died as a result of accidental bodily injury and alleged that the deceased died from natural causes brought about by arteriosclerotic cardiovascular disease. Trial was to a jury, after which the jury found that the death of deceased was caused by accidental bodily injury directly and independently of all other causes and effected solely through an accidental bodily injury. Judgment was rendered against Pan American Life Insurance Company in the face amount of the policy for the sum of $10,000.00, together with the statutory penalty and attorney's fees. Judgment was rendered against Banker's Life & Casualty Company in the face amount of the policy for the sum of $100,000.00, together with the statutory penalty and attorney's fees. Both defendants have appealed.

We affirm.

It was stipulated that the group policy issued by Pan American Life Insurance Company provided for payment in the event death was "the direct result of bodily injury through accidental means independently of all other causes, as evidenced by a visible contusion or wound on the exterior of the body," and that the group policy issued by Banker's Life & Casualty Company provided for payment in the event death was caused by "bodily injury directly and independently of all other causes and effected solely through an accidental bodily injury." The question of liability on both policies was submitted to the jury by Special Issue No. 1 which reads as follows: "Do you find from a preponderance of the evidence that the death of Benjamin Lindsey was caused by accidental bodily injury directly and independently of all other causes and effected solely through an accidental bodily injury?" The jury answered: "We do."

The basic facts out of which the case arises are not in dispute. On December 8, 1972, the body of Benjamin Lindsey, age 69, was found by a friend, Mrs. Florine Brown, a waitress at a Houston restaurant known as the Hickory Stick. She testified Mr. Lindsey came by the restaurant often; she had known him for 4 or 5 years and they were friends. The evidence shows that on December 8, 1972, Mr. Lindsey, who was a chemical engineer by profession, failed to report for work and his secretary called Mrs. Brown to see if she knew of his whereabouts. After the secretary had called a second time, Mrs. Brown testified that she drove to Mr. Lindsey's home. Receiving no answer to her knock at the door, she went around to the patio door. Looking through the patio door, she saw Mr. Lindsey, clad only in his underwear, lying on the floor with his head near the track of the sliding glass door in a pool of blood. She then went next door and contacted Mrs. Hopper, a neighbor, who had a key to Mr. Lindsey's house. Both entered the house and subsequently Mrs. Hopper went across the street and contacted Mrs. Giessel, a registered nurse. Mrs. Giessel testified that when she entered the house everything seemed to be in order. She testified she checked the deceased for pulse and breathing and, finding none, concluded that he was dead. Mrs. Giessel testified that Mr. Lindsey was lying on his stomach perpendicular to the patio door with his head against the back frame of the patio door. She testified that she saw a 2 to 2½-inch laceration above his left eye. She estimated the blood around his head on the floor to have been between a cup and a cup-and-a-half.

While Mrs. Brown, Mrs. Hopper and Mrs. Giessel were at the Lindsey home, they were joined by Mrs. Hopper's husband, Dr. John J. Hopper, who was a medical doctor employed by the Veteran's Administration Hospital. He had been Mr. Lindsey's neighbor for nine years and had known him

---

1. Plaintiffs originally instituted separate suits against each company which were subsequently consolidated for trial.

as a neighbor and a friend. Dr. Hopper testified that the deceased was lying on his left side with his head close to the patio door. Observing that Mr. Lindsey was apparently dead, Dr. Hopper testified he touched him on the neck and found him cold, pulseless and stiff, and concluded that he had been dead for several hours. He made no examination of the body. He testified that his initial impression was that Mr. Lindsey had stumbled, hit his head and fractured his skull, but admitted that this was only an assumption. He stated that Mr. Lindsey could have died of natural causes as a result of a stroke or a heart attack and then fallen, and that the only way to determine the cause of death was by a complete examination. He stated that a post-mortem examination would be required to erase his initial assumption about cause of death. While he had not seen Mr. Lindsey as an attending physician, he testified that he had known him as a friend and knew that Mr. Lindsey was a heavy drinker, a fact which was also confirmed by his niece, Mrs. Joan Smith and Mrs. Brown. Mrs. Smith testified that Mr. Lindsey used alcohol nearly every day during the last few years of his life.

On the night before his death, Mr. Lindsey had visited the Hickory Stick restaurant with his secretary and her husband. According to Mrs. Brown, the waitress, Mr. Lindsey had two drinks that night and did not eat his dinner. She testified that she wrapped his dinner for him to take home and she found it on the sink the next day when she entered his house.

Dr. Joseph Jachimczyk, Chief Medical Examiner of Harris County, Texas, was called as a witness by the defendants. Dr. Jachimczyk did not view or examine Mr. Lindsey's body, but in his capacity as Chief Medical Examiner he reviewed the photographs of the body taken by the police at the Lindsey home and the post-mortem examination report which was prepared by his assistant, Dr. Sheldon Green. He testified that, based on the report prepared by Dr. Green, he was of the opinion that Mr. Lindsey's death was caused by arteriosclerotic cardiovascular heart disease, resulting in a heart attack. The post-mortem report relied on by Dr. Jachimczyk reads in part as follows:

"Case 72–4694, December 9, 1972, post-mortem examination on the body of Benjamin Slayden Lindsey, 4839 Rockwood, Houston, Texas. History: This 68-year-old white man was found dead on the floor of the den at his home at the above address at approximately 4:30 p. m. on December 8, 1972. He was a known heavy drinker. View: The view was performed by Assistant Medical Examiner G. Sheldon Green, M.D., assisted by Dr. Paul G. Stimson, at the request of Chief Medical Examiner Joseph A. Jachimczyk, M.D., J.D., beginning at 9:00 a. m. on December 9, 1972, in the Harris County Morgue. External appearance: The body was that of a well-developed, well-nourished white man, appearing the stated age of 68 years, measuring 71 inches in length and weighing 118 pounds. There was fixed rigor mortis in the extremities. The hair was gray-brown, receding at the crown, measuring up to three inches in length posteriorly. The eyes were grey. The pupils were round and equal. The sclerae were slightly injected. The nose was somewhat enlarged, but the nasal bones were intact. There was a slight blood tinged fluid exuding from the nose. * * * The superficial neck veins were prominent. * * * There was one to two-plus pretibial and ankle pitting edema. The fingernail beds were cyanotic. There was nicotine staining on the thumb, index and middle finger of the left hand. * * * The cerebrospinal fluid was clear. A Vim-Silverman needle biopsy of the liver was performed."

At the time of trial Dr. Green was Chief Medical Examiner in Las Vegas, Nevada and did not testify. Dr. Jachimczyk admitted that his opinion as to the cause of death was based solely on the facts set out in the post-mortem examination report prepared by Dr. Green. He explained that arteriosclerosis is a condition marked by hardening, thickening and loss of elasticity of the arteries, which occurs over a period of time.

He testified that many of the findings set forth in the post-mortem report convinced him that the deceased suffered a heart attack, but admitted that his opinion was only as good as the post-mortem report on which his opinion was based. He further testified that an autopsy was the only absolute certain way to determine cause of death, but that no autopsy was performed because in his opinion it was not necessary in this instance.

He testified that the finding that the pupils of the eyes were round and equal was of significance to him in reaching his opinion, because if there had been an impact to the head and a subdural hematoma had formed, one would expect to find one pupil to be larger than the other; that it is not necessary for a person who dies of trauma to have a subdural hematoma, but that the absence of a hematoma goes to rule out that there was any traumatic injury to the head to cause subdural hemorrhage and death; and that death can result from a fall without a subdural hematoma if there are cerebral contusions and lacerations. He testified that the findings of prominent superficial neck veins, edema, cyanotic fingernail beds and the absence of blood in the cerebrospinal fluid were all consistent with his conclusion that the deceased suffered from arteriosclerotic cardiovascular heart disease and died as a result of a heart attack.

He testified that although the post-mortem report failed to show the lacerations on the deceased's forehead, he could see the wound in the photographs showing a laceration on the forehead with leakage of blood coming from approximately above the nose and between the eyeballs over the grabella area of the skull. Laboratory analysis of the blood indicated that the deceased had no alcohol in his system at the time of death. He was of the opinion that the amount of blood under the head would not account for any significant stroke or death. He testified that the existence of a laceration and the amount of blood shown in the photograph would not cause him to change his opinion as to the cause of death; however, he admitted a person can die of trauma with this amount of blood. Further, he testified that, based on the circumstances alone, a logical conclusion would be that the deceased had met his death as a result of an accident.

It is significant to note that the post-mortem report relied on by Dr. Jachimczyk did not mention the laceration on the decedent's forehead, nor did the report specifically rule out the possibility of a fractured skull or a broken neck.

Mrs. Smith, a niece of the deceased, testified that she was fairly close to her uncle and that she had seen him every two or three weeks during the period prior to his death and that he was in good health at the time of his death. She testified that he had never complained to her of having any sort of health problem and that she had no knowledge from any other source that he was suffering from any health problem.

Under their first point of error, defendants contend that the court erred in overruling their motion for judgment non obstante veredicto, because there was no evidence to support the jury's finding that the death of the decedent was caused by accidental bodily injury directly and independently of all other causes. They argue that in order for the jury to answer Special Issue No. 1 in the affirmative, the jury was required to draw two inferences from the evidence showing the circumstances under which the body was found. They argue that, after drawing an initial inference that the decedent did in fact suffer accidental injury, the jury then had to draw the additional inference that the accidental injury was the sole cause of death. Defendants contend that in the absence of any direct or expert testimony from plaintiffs as to the cause of death, there is no evidentiary basis to support the jury's finding.

■ Under the coverage clauses of the policies, the burden was on the plaintiffs to prove that the death of the decedent was caused by accidental bodily injury directly and independently of all other causes and was effected solely through an accidental bodily injury. Such burden of proof, how-

ever, may be discharged by direct or circumstantial evidence as in all other civil cases. *Commonwealth Casualty & Ins. Co. v. Laurence,* 223 S.W.2d 337 (Tex.Civ.App. —Fort Worth 1949, no writ history); *Universal Life & Accident Insurance Co. v. Beaty,* 177 S.W.2d 244 (Tex.Civ.App.—Waco 1944, no writ history).

Passing for the moment the question of whether the injuries caused the death, we will first consider whether the evidence is sufficient to support the jury's finding that the injury sustained by the deceased was accidental.

■ It is generally held that where death by unexplained, violent and external means is established, a presumption is thereby created or prima facie proof is thereby made of the fact that the injuries were accidental, without direct and positive testimony on that point, since the law will not presume that the injuries were inflicted intentionally by the deceased or by some other person. *Republic Nat. Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 558–59 (Tex.1976); *Broyles v. Order of United Commercial Travelers,* 155 Kan. 74, 122 P.2d 763 (1942); 142 A.L.R. 742, 745 (1943); 12 A.L.R.2d 1264 (1950); 44 Am.Jur.2d *Insurance* sec. 1965, p. 905. Applying the foregoing rule of law to the facts presented here, it seems clear that the circumstantial evidence was sufficient to make out a prima facie case showing that the injuries received by the decedent were accidental.

The next question to be determined is whether the accidental injuries caused the decedent's death.

■ The policies in question require that the accident be the independent cause of death. Coverage clauses of this nature have been construed to require a showing that the accidental injury was the sole proximate cause of death. *Mutual Benefit Health & Accident Ass'n v. Hudman,* 398 S.W.2d 110, 112 (Tex.1965); *National Life & Accident Insurance Co. v. Franklin,* 506 S.W.2d 765, 767 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n. r. e.). Nevertheless, recovery is not defeated by a pre-existing condition or disorder which is so remote in the chain of causation that it does not materially contribute to death. *Stroburg v. Insurance Company of North America,* 464 S.W.2d 827, 829 (Tex.1971); *Mutual Benefit Health & Accident Ass'n v. Hudman,* supra; *Western Indemnity Co. v. MacKechnie,* 214 S.W. 456 (Tex.Civ.App.—Dallas 1919, n. w. h.).

■ The language of the policies in question to the effect that accidental bodily injury must have operated "independently of all other causes" to produce death does not change the general rule of law that the proximate and not a remote cause is the one to which the law looks. *Stroburg v. Insurance Company of North America,* supra; *Bohaker v. Travelers Ins. Co.,* 215 Mass. 32, 102 N.E. 342, 46 L.R.A.,N.S., 543 (1913). In the present case the jury found from a preponderance of the evidence that the death of the insured was caused by accidental bodily injury directly and independently of all other causes. This finding leads to the obvious conclusion that the bodily injury was the sole, only and independent cause of the insured's death.

■ It is true no medical doctor testified that the injuries sustained by the insured caused his death. However, there need not necessarily be direct proof or evidence of the cause. The cause may be found by the jury from facts and circumstances. The question of proximate cause or sole proximate cause is generally held to be one for the trier of the fact. *Metropolitan Casualty Ins. Co. v. Edwards,* 210 S.W. 856 (Tex.Civ. App.—Amarillo 1919, writ dism'd); *North American Acc. Ass'n v. Adams,* 32 S.W.2d 525 (Tex.Civ.App.—San Antonio 1930, n. w. h.); 18 Couch on Insurance 2d sec. 74:697, 698, 699.

■ In view of the evidence showing that the deceased was apparently in good health; that he suffered a rather severe injury to his head; and that after the injury his heart apparently was able to continue functioning long enough to cause a cup or a cup-and-a-half of blood to flow from the wound on his forehead, and considering the

fact that no autopsy was performed, we cannot say that there was no evidence to support the jury's finding that the death of the insured was caused by accidental bodily injury directly and independently of all other causes. See *Order of United Commercial Travelers of America v. Roth*, 159 S.W. 176 (Tex.Civ.App.—Fort Worth 1913, writ ref'd); *Order of United Commercial Travelers v. Simpson*, 177 S.W. 169 (Tex.Civ.App.—Dallas 1915, writ ref'd); *Metropolitan Life Ins. Co. v. Funderburk*, 81 S.W.2d 132 (Tex.Civ.App.—Beaumont 1935, writ dism'd); *American Casualty Co. v. Jones*, 146 S.W.2d 423 (Tex.Civ.App.—Amarillo 1940, no writ history); *Universal Life & Accident Ins. Co. v. Beaty*, 177 S.W.2d 244 (Tex.Civ.App.—Waco 1944, no writ history); *Commonwealth Casualty & Insurance Co. v. Laurence*, 223 S.W.2d 337 (Tex.Civ.App.—Fort Worth 1949, no writ history); *Royal Indemnity Company v. Hume*, 477 S.W.2d 683 (Tex.Civ.App.—San Antonio 1972, no writ history); *Broyles v. Order of United Commercial Travelers*, supra; *Maryland Casualty Co. v. Burns*, 149 Ky. 550, 149 S.W. 867 (1912); 10 Couch on Insurance 2d sec. 41:45; 18 Couch on Insurance 2d sec. 74:699. In our view the record is such that the jury could have reasonably concluded that even though the insured may have had an arteriosclerotic condition, it was so insubstantial in the scale of causation that it did not, in legal contemplation, contribute to cause death.

Contrary to defendants' contention we do not believe the jury's verdict is based on a pyramiding of inferences. The only inference necessary to establish defendants' liability is that the injury was accidentally received. The finding that the injury was the sole cause of death rests on the proven fact, established by direct and circumstantial evidence, that deceased received a rather severe injury to his head, and not on the inferred fact of accident.

■ Defendants insist that the testimony of Dr. Jachimczyk shows conclusively that the sole cause of the deceased's death was arteriosclerotic cardiovascular heart disease resulting in a heart attack, which caused him to fall and sustain the injury to his head. Since such testimony is without contradiction, defendants argue that the record conclusively establishes, as a matter of law, that the death of the deceased was caused solely by disease or bodily infirmity. We find no merit in this contention. Such testimony was not in the nature of fact testimony but was peculiarly of the "opinion" or "expert" type. While the opinions of trained pathologists and physicians as to cause of death are admissible in evidence as expert testimony in the medical field, such opinions are not conclusive. *Metropolitan Life Ins. Co. v. Funderburk*, supra; *Travelers' Ins. Co. v. Culpepper*, 82 S.W.2d 1054, 1057 (Tex.Civ.App.—Beaumont 1935, writ dism'd). Even when uncontradicted, that character of testimony is but evidentiary and not binding on the jury unless the subject is one in which the jury cannot be assumed to have any knowledge on the subject matter of the inquiry. *Coxson v. Atlanta Life Ins. Co.*, 142 Tex. 544, 179 S.W.2d 943 (1944). As we view the record that situation does not exist here.

■ In determining whether there is any evidence of probative force to support the jury's finding, we are required to view the evidence in its most favorable light in support of the finding, considering only the evidence and inferences which support the finding and rejecting the evidence and inferences which are contrary thereto. *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773 (Tex. 1974). Applying the foregoing rule to the facts of the present case, it is our view that there was some evidence of probative force to support the verdict and therefore the trial court did not err in overruling defendants' motion for judgment non obstante veredicto. Defendants' first point is overruled.

By the second point defendants seek a reversal and remand on the ground that the evidence is factually insufficient to support the jury's finding to Special Issue No. 1.

After a review of the entire record and after weighing and balancing all of the evidence, both that in favor of the verdict and that against it, we do not believe we

would be justified in concluding that the evidence is factually insufficient to support the jury's finding and the judgment based thereon. The second point is overruled.

▐ Defendants' third point of error complains of the action of the trial court in excluding that portion of the deceased's death certificate wherein it was stated that "arteriosclerotic cardiovascular disease" was the immediate cause of death. The record shows that the death certificate was signed by Dr. Sheldon Green and was properly authenticated by the State Registrar.

In pertinent part, Rule 54a of Article 4477, Tex.Rev.Civ.Stat.Ann., reads with regard to death certificates as follows:

"And any such copy of a record, when properly certified by the State Registrar, shall be prima facie evidence in all courts and places of the facts therein stated."

Counsel for the plaintiffs objected on the ground that the death certificate amounted to an opinion on the part of the doctor as to the cause of death and was hearsay. After the cause of death portion of the certificate had been deleted, the court admitted the remainder of the certificate in evidence. Defendants maintain that under the above quoted statute the entire instrument was admissible and that the court erred in refusing to admit it in toto.

Even if the exclusion were improper, we do not believe it resulted in any harm to defendants. The post-mortem report on which Dr. Green based his opinion as to the cause of death was admitted into evidence. While his opinion as to the cause of death was deleted from the report, Dr. Jachimczyk, using the report as the basis of his testimony, testified that the report showed that the deceased died of arteriosclerotic cardiovascular heart disease, the identical cause of death given by Dr. Green in the death certificate. The cause of death shown on the death certificate would have been merely cumulative of the opinion expressed by Dr. Jachimczyk. For this reason we do not believe it can be said that the exclusion was calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Tex.R.Civ.P.; *Burk v.*

*Mata*, 529 S.W.2d 591, 596 (Tex.Civ.App.—San Antonio 1975, writ ref'd n. r. e.). Accordingly, defendants' third point is overruled.

The judgment of the trial court is affirmed.

Dissenting opinion by McKAY, J.

McKAY, Justice, dissenting.

I respectfully dissent.

The majority opinion does not rule on the question of the admissibility of the entire death certificate—including the statement of the cause of death, but, instead holds that if it was *improper* to exclude the cause of death statement on the certificate it was harmless error. Article 4477, Rule 54a, Tex.Rev.Civ.Stat.Ann., provides that when a death certificate is properly certified "it shall be prima facie evidence in all courts and places of the facts therein stated." The death certificate in this case was properly certified by the Bureau of Vital Statistics, and was signed by Dr. Sheldon Green, M.D., Assistant Medical Examiner.

This court said in *Reserve Life Ins. Co. v. Estate of Shacklett*, 412 S.W.2d 920, 922 (Tex.Civ.App.—Tyler 1967, writ ref'd n. r. e.):

"The death certificate complies fully with the provisions of Vernon's Ann. Civ.St. Article 4477, Rule 54a, and the certificate of the State Registrar was in all things proper. We find the law in this State to be that such certificates are not only admissible in evidence, but are prima facie evidence of the facts therein stated. In this certificate, the statement is made that the death of the insured was an accident. *American Nat. Ins. Co. v. Valencia*, Tex.Civ.App., 91 S.W.2d 832; *Southland Life Insurance Co. v. Brown*, supra [Tex.Civ.App., 121 S.W.2d 653]; *Universal Life & Accident Ins. Co. v. Barron*, Tex.Civ.App., 269 S.W.2d 467."

It was held in *Buchanan v. American National Ins. Co.*, 446 S.W.2d 384, 387 (Tex. Civ.App.—El Paso 1969, writ ref'd n. r. e.), that when all the requirements of Art. 4477,

Rule 54a, are met a death certificate "is not only admissible in evidence but is prima facie proof of the information therein contained."

*Burrous v. Knotts*, 482 S.W.2d 358, 362 (Tex.Civ.App.—Tyler 1972, no writ), followed *Shacklett* and *Valencia*. See *Texas State Highway Department v. Butler*, 158 S.W.2d 878, 881 (Tex.Civ.App.—Texarkana 1942, writ ref'd want of merit) and authorities therein cited.

Here we have a duly authenticated death certificate prepared and signed by a medical doctor who was the Assistant Medical Examiner. Under the statute and the authorities the death certificate was admissible in its entirety (including the statement as to the cause of death). If it had been admitted the jury was not bound to accept it as conclusive proof, but it should have been admitted for the jury's consideration.

Judge Alexander wrote in *Southland Life Ins. Co. v. Brown*, 121 S.W.2d 653, 654 (Tex. Civ.App.—Waco 1938, writ dism'd):

". . . The Death certificate shows that the insured committed suicide, and the statute, R.S. 4477, rule 54a, sec. 21, makes properly certified copies of such certificates prima facie evidence of the facts therein stated. However, the presumption in favor of the truth of the facts therein recited can be no stronger than the evidence authorizing the making of such statement in the original certificate. The jury was not required to accept the recitations contained in such certificate as conclusive proof of the fact that the insured committed suicide."

Although Dr. Jachimczyk may have read Dr. Green's notes or report, and then testified that his opinion was that the cause of death was the same as Dr. Green had stated in the death certificate, the jury was denied the opportunity to see and consider the cause of death statement by Dr. Green on the death certificate. The majority opinion says that the information on the certificate was cumulative. If the entire death certificate should have been admitted, and was not, it seems there should be no presumption as to the effect it may have had on the jury; nor is that conclusive of whether the error was calculated to cause and probably did cause the rendition of an improper judgment.

The one basic issue in this case was the question of the immediate cause of death—whether death was "the direct result of bodily injury through accidental means *independently of all other causes*, as evidenced by a visible contusion or wound on the exterior of the body." In my view the jury should have been permitted to have before it the admissible evidence on the cause of death in the death certificate.

In my opinion it was reversible error for the trial court to exclude the portion of the deceased's death certificate wherein it was stated that "arteriosclerotic cardiovascular disease" was the immediate cause of death. I would reverse the judgment of the trial court and remand the cause to that court.