**PHOENIX INSURANCE COMPANY,**
Appellant,

v.

**R. A. BRADLEY, Appellee.**

No. 7813.

Court of Civil Appeals of Texas.

Texarkana.

May 2, 1967.

Rehearing Denied May 30, 1967.

William G. Fox, Bryan, Suhr, Bering & Bailey, Jack R. Martin, Martin & Knox, Houston, for appellant.

Richard P. Hogan, Helm, Jones Pletcher, Houston, for appellee.

FANNING, Justice.

A workmen's compensation case. The jury found that appellee employee was in the course of his employment at the time he received injuries. All issues were answered favorably for plaintiff-appellee, and the court entered judgment for plaintiff-appellee for compensation and for certain medical expenses. Appellant insurer has appealed.

Appellant presents two points on appeal, contending that there was no evidence that appellee employee was in the course and scope of his employment when he received the injuries sued upon and that such finding of the jury also was so against the overwhelming weight and preponderance of the evidence as to be manifestly unfair and unjust.

For a comprehensive discussion of the law applicable to the determination of such character of points see Chief Justice Calvert's article, " 'No Evidence' and 'Insufficient Evidence' Points of Error' ", 38 Tex.Law Rev., No. 4, p. 361.

Plaintiff employee at the time he received the injuries sued upon was an employee of Roosevelt Hotel in Houston. His principal duty was that of a desk clerk; he also lived in the hotel and got his room and laundry as part of his compensation; his regular schedule called for an 8 hour shift, however, he would stay at his desk until another desk clerk came on to take over the desk and relieve him; appellee also testified as to performing such other duties for his employer as might be needed. While appellee was not required to live in the hotel, it was convenient for the hotel to have appellee live in the hotel and it was also convenient for appellee to live in the hotel.

Plaintiff-appellee testified that on December 4, 1964, the date of his injuries, that he relieved another desk clerk at 2:00 P.M., and went to work and was supposed to get off work at 10:00 P.M., when another desk clerk, Andrew Vondee, who also lived in the hotel, was due to take over as desk clerk and relieve plaintiff-appellee. Plaintiff testified that when he got off work at 10:00 P.M. it was his usual custom to go and eat and return to the hotel and go to bed; that he would usually get up in the morning at 7:00 or 8:00 A.M., that from 7:00 or 8:00 A.M. he would "go by the office and see if there was anything for me to do and if they didn't have anything I would walk around for a while and come back and go in my room and rest before I would go to work at 2:00 o'clock", that he did not punch a time clock, that he just had to be on duty. We quote in part further testimony of plaintiff-appellee as follows:

"Q. When you got off at 10:00 o'clock at night were you required to continue any duties around the hotel any place?

A. If there was anybody sick or didn't feel like coming to work they would notify you and you could work in their place.

Q. Had you ever done that before?

A. Absolutely I have.

Q. Mr. Bradley, I want you to think about this night of December 4, 1964. I want you to tell the jury what time you went on duty that day.

A. I went on at 2:00 o'clock.

Q. Who did you relieve at 2:00 o'clock?

A. I relieved the morning man.
 *      *      *      *      *      *

Q. Did you get off at 10:00 o'clock?

A. No, not that night.

Q. What took place that day or night that prevented you from getting off at 10:00 o'clock?

A. Well, they have a call—you call the clerk that is going to relieve you

before time for him to come to work and wake him up.

Q. Did you do that that night?

A. Yes, I called him at 9:30.

Q. Was this the first time you called him?

A. That was the first time.

Q. When you say you called 'him', who are you talking about?

A. Vondee.

*　*　*　*　*　*

Q. But Andrew Vondee was the person who was to relieve you, is that correct?

A. Yes.

Q. You called him for the first time at 9:30?

A. Yes.

*　*　*　*　*　*

A. I told him it was 9:30 just like I always do.

Q. Did you hang up?

A. Yes, he answered. I hung up.

Q. Did he come down between 9:30 when you called him and 10:00 o'clock when you got off?

A. No.

Q. Had he ever been late before?

A. Well, sometimes five or ten minutes. I didn't pay no attention to nothing like that.

Q. What time did he come down this night?

A. I called him three times thirty minutes apart.

Q. Did you call him again at 10:00 o'clock?

A. Yes, and 10:30.

Q. Did he answer his phone in his room all those three occasions?

A. He answered every time.

*　*　*　*　*　*

Q. When you called him on these two occasions what, if anything, did he say to you, if you recall?

A. He just said I will be down after a little.

Q. When he didn't show up at 10:00 o'clock did you call him or send anybody up to look after him or see if he was coming down?

A. I didn't have nobody to send without turning loose everything there and going myself. I called him again.

*　*　*　*　*　*

Q. When you called at 10:00 o'clock did that second call get Mr. Vondee down?

A. He answered.

Q. Did he come down and relieve you?

A. No.

Q. How long did you have to wait after you called him at 10:00 o'clock?

A. It was between 11:00 and 12:00 when he came down.

Q. What, if anything, was said at the time he came down there?

A. Well, he came down raising sand because I hadn't called him. I only called him three times.

*　*　*　*　*　*

Q. Did you see him when he came down there?

A. Yes, I saw him.

Q. Where were you when he came down?

A. In the office.

Q. Did you proceed to check up for the evening when Mr. Vondee got there?

A. No, I didn't.

Q. What happened?

A. Because he started raising sand because I didn't call him. I told him I had called him. He disputed me and said a bad word, called me a bad name, shoved me, and that's what started the ball rolling.

Q. Had you said anything to him or used any bad language or cursed him?

A. No.

Q. He accused you of not calling him, is that correct?

A. That is right.

Q. And you say that he shoved you?

A. He shoved me.

Q. Where did he shove you?

A. He shoved me away from where I was.

Q. Did he shove you against something?

A. He shoved me against the key box.

Q. That is where you hang the keys up?

A. We put them in—it is just like a pigeon hole.

Q. How far did he shove you?

A. Not too far.

Q. Did that injure you?

A. It hurt me.

Q. Where did it hurt you?

A. In my back.

*    *    *    *    *    *

Q. What, if anything did you do then, at that time, when you were shoved up against the key box?

A. I told him, wait, listen, I don't want to be run over, nothing like that. I didn't know what had happened, it was all done so quick. I didn't know what happened.

Q. Did you actually have a fight at that time?

A. We didn't have no fight. We had a tussle.

Q. Did you push him or did he push you any more after he shoved you the first time?

A. He hit at me and I ducked and dodged his lick.

Q. Did you do anything to provoke that punch, such as did you call him names, do anything, push or shove, prior to the time Mr. Vondee pushed you the first time up against the key box?

A. No.

Q. After he pushed you up against the key box did you push away or jump back at him or did he begin swinging at you first?

A. He had me in the key box, just pushed me in the stomach, right there, with both fists and I shoved him away and he hit at me again and he fell against the swinging door that come in here.

*    *    *    *    *    *

A. He fell when he swung at me and I jumped to one side.

Q. When you jumped to one side he hit the swinging door, where did you go?

A. That wound it up. I just went on and washed up like I always do and went and got something to eat.

Q. Did you go to your room to wash up?

A. Yes.

Q. How long were you up there?

A. Not but a few minutes.

\* \* \* \* \* \*

Q. Mr. Bradley, is it your testimony that up until the time you went up to your room to wash up that you had not swung or hit Mr. Vondee at all with your fist? Is that correct?

A. I was just trying to keep him from hurting me.

Q. When he came downstairs did he seem irritated at you at the time he *came down between 11:00 and 12:00?*

A. He looked like he was irritated with everybody.

Q. Was there anything about his condition that you noticed in particular, Mr. Bradley?

A. When he came down to relieve me, I was sure he was drinking when he came downstairs.

\* \* \* \* \* \*

Q. Mr. Bradley, at the time that you smelled this whatever it was on the breath of Mr. Vondee, could you tell the jury whether or not there was anything else unusual about his appearance?

A. Well, he just acted funny to me. I knew he was not right or something.

Q. Had he ever acted that funny way before?

A. I don't think so.

\* \* \* \* \* \*

Q. Did you go downstairs and stay downstairs or did you leave the hotel when you came down from washing up?

A. I came down and went and got something to eat.

Q. What time was it that you went to get something to eat?

A. Between 11:30 and 12:00.

Q. That is 11:30 or 12:00 o'clock at night?

A. Yes.

\* \* \* \* \* \*

Q. How long were you at the Western Grill?

A. Not long. I just ate and left and went on back.

Q. When you got back approximately how long had you been gone?

A. Oh, approximately thirty or forty *minutes.*

Q. When you returned there who did you see?

A. Well, I didn't see nobody in the lobby.

Q. No one in the lobby?

A. No.

Q. Was Mr. Vondee on the front desk?

A. He was in the office.

Q. *Did you see him as you walked in the door?*

A. I walked in the door and he—I won't tell you what he said, but he said you are not going to get away with this.

Q. What did you say to him?

A. I said I don't want no more trouble, let's just forget about everything, I don't want any trouble.

Q. What did you do at that time? What did you do?

A. I started upstairs.

\* \* \* \* \* \*

A. I started to go upstairs and he came out of the office with that club.

Q. What kind of club?

A. A police billy.

Q. How long was it?

A. It must have been this long, one of them the police use, a billy.

Q. A billy club?

A. Yes. They kept it in the office.

Q. Was it his?

A. No, it belonged to the hotel.

Q. Had this billy club been used in that altercation you earlier had there in the small office?

A. No.

Q. When you came back had you done anything or said anything to Mr. Vondee to cause him to come out at you with the club?

A. No, not one word.

Q. What did he do when he came through the door of the office? Is that the swinging door?

A. Yes, the one he fell against there.

Q. When he came out after you got back from eating did he come through the same swinging door?

A. Yes.

Q. Where were you at the time he came through the door?

A. Between there and the stairway.

Q. What did you do?

A. I started up the stairway. He hit me on this leg and I went down and grabbed that leg. Then he liked to have beat me to death with the club.

   *    *    *    *    *    *

■ For an injury to be incurred in the course and scope of employment, it must originate in or grow out of the work being done for the employer. Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 28 A.L.R. 1402 (1922).

Article 8309, Sec. 1, Vernon's Ann.Tex. St. provides that the term " 'injury sustained in the course of employment,' * * * shall not include: * * * (2) An injury caused by an act of a third party intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment. * * *

"(4) An injury caused by the employee's wilful intention to injure himself, or to unlawfully injure some other person, but shall include all other injuries of every kind and character having to do with and originating in the work * * * of the employer received by the employee while engaged in or about the furtherance of the affairs or busines of his employer. * * *"

■ Where an employee is injured in a personal difficulty arising over the manner in which the work of the employer is being done, although the difficulty itself is not a part of the work of the employer, the injured employee is entitled to workmen's compensation under the Texas act. McClure v. Georgia Casualty Co., Tex.Com. App., 251 S.W. 800 (1923); Commercial Standard Ins. Co. v. Austin, Tex.Civ.App., 128 S.W.2d 836, wr. dism. judg. cor. (1939); Associated Emp. Lloyds v. Groce, Tex.Civ. App., 194 S.W.2d 103, wr. ref., n. r. e. (1946).

In Commercial Standard Insurance Company v. Austin, supra, a workmen's compensation case, a quarrel arose between two employees over the manner of doing the work of the employer. One of these employees was discharged, left the site of the work, returned about an hour later and shot and killed the other employee. It was held that this evidence supported a jury verdict for the legal beneficiaries of the deceased employee.

In McClure v. Georgia Casualty Co., supra it was stated in part as follows:

"When an injury is received by an employee as the direct result of an assault upon him while in the performance of the duties of his employment and when exposure to the danger of such an assault is a natural incident of his employment and one of the risks assumed by him in entering upon and continuing in the same,

such injury has to do with and originates in the business of his employer, notwithstanding the party making such assault may be actuated by malice and may plan and execute the same with deliberate intention to injure."

It is clear there was evidence of probative force that the first assault upon appellee was started by Vondee, and was directed against appellee by reasons growing out of his employment.

The hours to be worked or the schedule of each desk clerk's duties were matters which had to do with the manner in which the work was to be done. The 30 or 40 minutes which elapsed when the appellee left the hotel to eat did not cause Vondee to calm down enough to douse the quarrel which arose over the manner appellee and Vondee were to carry on their duties for their employer.

■ The first assault by Vondee upon appellee clearly occurred in the course of appellee's employment. We think that Vondee's second assault upon appellee, when appellee returned to the hotel after eating, some 30 or 40 minutes later, was so related in time and place to the first assault as to be causally connected to the first assault, and that the second assault was also causally connected to the manner used by the two fellow employees in conducting the employer's business. We think under the facts in this case the quarrel in question from origin to ending must be taken as one. We think this quarrel and the injuries sustained by appellee grew out of the work being done for the employer and such injuries were compensable under the Texas Workmen's Compensation Act. In addition to the authorities above cited see the following authorities: Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103,.246 S.W. 72, 28 A.L.R. 1402 (1922); United States Casualty Company v. Henry, Tex.Civ.App., 367 S.W.2d 405, wr. ref., n. r. e. (1963); Aetna Casualty & Surety Co. v. England, Tex.Civ.App., 212 S.W.2d 964, no writ (1948); Travelers' Ins. Co. v. Culpepper, Tex.Civ.App., 82 S.W.2d 1054, wr. dism. (1935).

■ The Texas Workmen's Compensation Act must be given a liberal construction to carry out its evident purpose. In this connection, see Shelton v. Standard Insurance Company, Tex.Sup.1965, 389 S.W.2d 290, where it was stated in part as follows:

"It could not be seriously contended that petitioner, while crossing the street, was in the scope of his employment for establishing liability under the doctrine of respondeat superior, but our Workmen's Compensation Act must be given a liberal construction to carry out its evident purpose. 'An injury has to do with, and arises out of, the work or business of the employer, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent in or incident to the conduct of such work or business.' Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 28 A.L.R. 1402. * * *"

Also in Employers Mut. Liability Ins. Co. of Wis. v. Konvicka, 197 F.2d 691, 5th Cir., (1952), the court, after stating the rule of liberal construction of the Texas Workmen's Compensation Act, further stated in part as follows:

"In cases on or near the border line, the act should 'be construed liberally and with common sense, to give effect to its purpose, the protection of employees, while in and about their work.' Winder v. Consolidated Underwriters, 5 Cir., 107 F.2d 973, 975."

We hold that there is evidence of probative force in the record to support the jury's finding that plaintiff-appellee was in the course of his employment at the time he received the injuries sued upon. Appellant's first point is overruled.

After carefully considering the entire record in this cause in the light of the rules announced in the case of In re King's

Estate, 150 Tex. 662, 244 S.W.2d 660 (1952), it is our further view that the jury's finding that plaintiff-appellee was in the course of his employment at the time he received the injuries sued upon is not so contrary to the great and overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Appellant's second point is overruled.

The judgment of the trial court is affirmed.