**U. F. SMITH, Appellant,**

v.

**Mrs. Bonnie WELCH et al., Appellees.**

No. 6839.

Court of Civil Appeals of Texas.

Texarkana.

Dec. 8, 1955.

Rehearing Denied Jan. 19, 1956.

Allen Clark, G. C. Harris, Greenville, for appellant.

Wm. C. Parker, L. L. Bowman, Jr., Greenville, for appellees.

HALL, Chief Justice.

This cause involves the contest of the will of the late J. W. Smith, which was filed for probate in the County Court of Hunt County, Texas, December 6, 1954. A contest was filed by appellees, alleging that J. W. Smith at the time he executed the will did not have testamentary capacity. Upon a hearing in the County Court the will was duly probated. An appeal was taken to the District Court of Hunt County where the matter in controversy was submitted to a jury which found that the testator, Smith, lacked testamentary capacity. In response to said verdict judgment was entered denying the probate of the will.

Appellant brings forward three points. No. 1, asserting that the court erred in overruling appellant's motion for directed verdict at the conclusion of the evidence:

(a) "The evidence conclusively showed that the deceased, J. W. Smith, was of sound mind and possessed testamentary capacity when he executed the instrument.

(b) "There was no evidence that at the time of the execution of the instrument J. W. Smith, deceased, was not of sound mind or did not have testamentary capacity.

(c) "The evidence was wholly insufficient to raise any fact issue that at the time the instrument was signed by the deceased, he was not of sound mind or did not possess testamentary capacity."

Point 2, that the court erred in overruling the appellant's motion for judgment non obstante veredicto because:

(a) "As a matter of law the evidence showed that the testator J. W. Smith had testamentary capacity at the time he executed the instrument.

(b) "The evidence conclusively and without contradiction showed at the time of executing by the testator the instrument offered for probate he had testamentary capacity.

(c) "The finding of the jury that testator did not have testamentary capacity at the time he executed the instrument offered for probate is contrary to the weight of the great preponderance of the evidence.

(d) "The finding of the jury that the testator did not have testamentary capacity is without support of any evidence of probative force."

Point 3:

"The court erred in submitting the single issue to the jury as to whether or not J. W. Smith, deceased, possessed testamentary capacity at the time he executed the instrument because:

(a) "There was no evidence to support the finding of the jury in its answer to such issue.

(b) "There was no evidence raising such issue.

(c) "The overwhelming preponderance of the evidence shows that the deceased, J. W. Smith, was a person of sound mind and possessed testamentary capacity at the time he executed the instrument."

The above three points and their subsections all are directed to the insufficiency of the evidence to support the verdict of the jury.

The undisputed facts show that J. W. Smith was stricken with paralysis in the town of Floyd, Hunt County, on or about September 9, 1952. His nephew, the son of a deceased sister, with whom deceased was making his home, telephoned the brother of J. W. Smith in Dallas, Texas, appellant here, of J. W. Smith's condition. Appellant immediately went to Floyd, Texas, and took J. W. Smith to Baylor Hospital in Dallas where he remained until November 4, 1952. On that date J. W. Smith left Baylor Hospital and was carried to an apartment owned by one of the physicians who attended him at the hospital. Smith remained in the apartment for a short time, after which he was removed to the home of appellant in Dallas where he remained until the early part of 1954.

J. W. Smith was a bachelor, aged about 70 or 71 years when stricken. He lived with his mother at Floyd, Texas, until her death, afterwards living for several years with his sister, Mrs. Howard of Floyd. Sometime in the early part of 1953, after leaving Baylor Hospital and his physician's apartment, Smith began traveling in his pick-up truck to look after his property located near Floyd. He had renters on his property who were engaged in farming. The evidence is undisputed that Smith frequently visited in Floyd, his farm nearby, and in the city of Greenville. Numerous witnesses testified to seeing him at these places.

J. W. Smith's estate consists of about $65,000 on deposit in a Greenville bank, 213 acres of land, and a pick-up truck. The will here in question was prepared for J. W. Smith by his attorney, G. C. Harris, on July 11, 1953. The will is dated the ———— day of July, 1953, and leaves all of J. W. Smith's property to his only brother, U. F. Smith, appellant herein, with whom decedent lived after the stroke in September, 1952, excluding the time spent in Baylor Hospital and Phillips Clinic. Attorney G. C. Harris testified that the will was brought to his office for safe-keeping by appellant

about three weeks after he had prepared the will. The evidence by Harris is that J. W. Smith came to his office on July 11, 1953, for the purpose of having his will prepared. The matter was discussed between him and Harris, and Harris in J. W. Smith's presence dictated the will. In the afternoon of the same day Smith returned to Harris' office and took the will with him. The will was attested by Paul Mathews and J. W. Birdsong, both residents of Greenville, and employees of the Greenville National Exchange Bank. One of the attesting witnesses, Mathews, testified that he and Birdsong signed the will in the presence of each other and of J. W. Smith at his request, but he did not know whether the will was signed by J. W. Smith in their presence or whether it had been signed when it was submitted to them for their signatures. However, no question as to the regularity of the will is raised, except that of testamentary capacity of the testator. The evidence is further undisputed that during the spring and summer of 1953, as well as during crop-gathering time of that year, J. W. Smith was up and about, looking after the business of his farm.

On March 6, 1954, J. W. Smith was admitted to the Phillips Clinic in Greenville where he remained until his death on the 30th day of the following November.

The record reflects that appellees produced 11 witnesses, some of whom were relatives of deceased, two doctors who attended deceased while he was in Baylor Hospital, and several other persons who lived in Greenville and around the town of Floyd, who testified to the mental condition of the deceased at various times before and after the will was executed. Two other witnesses, one a bookkeeper at the Greenville National Exchange Bank who testified with respect to deceased's money on deposit in the bank, and the other the tax collector at Greenville who testified to his other properties, land and truck. Only one of appellees' witnesses, namely D. E. Ellis, testified to the condition of deceased's mind at a time anywhere near the date of the execution of the will. This witness lived in Greenville and it is his testimony that he saw the deceased some time during the summer of 1953. He did not fix a date any nearer than that. He saw deceased on one occasion at his store and talked with him, and on two other occasions he talked with him on the square at Greenville. The witness stated that in these conversations the deceased would change abruptly from one subject to another; his conversation was not connected, and that deceased did not seem to be in possession of his mental faculties. This witness had known deceased quite a while and was friendly with him. He also testified that deceased knew him on every occasion they talked together. The two physicians at Baylor Hospital who were in attendance upon J. W. Smith while he was a patient there in 1952 testified that he was suffering from a serious stroke when he entered the hospital. This stroke was so serious that he was unconscious for several days and they held out little hope for his recovery; however, his condition greatly improved until he left the hospital and went into an apartment owned by one of his physicians. Both these doctors testified that the stroke was of such nature that it was calculated to cause a lasting injury to the brain. Neither of these physicians saw J. W. Smith after November 6, 1952. The other witnesses, as heretofore pointed out, based their opinion of the mental capacity of deceased upon their conversations with him and their observations of him, some during the time he was in Baylor Hospital, and while he was at his brother's home in Dallas, all of which occurred in the fall of 1952. Other conversations with persons in Greenville and Floyd testified to by other witnesses were during the spring of 1953 or the fall of 1953. Some of the testimony was in the spring and summer of 1954, during the time deceased was in Phillips' Clinic in Greenville. The testimony of the 16 witnesses for appellant is quite contrary to that produced by the appellees, especially with reference to time. Mr. G. C. Harris, an attorney at Greenville, one of the representatives of appellant in this case, drafted the will for deceased which is now in controversy. He testified that deceased came to his office on the second floor in Greenville alone on

the morning of July 11, 1953, and discussed with him the making of a will; told him the disposition he wished to make of his worldly effects; and from this information attorney Harris dictated the will to his stenographer. Smith left the office and came back in the afternoon of the same day and got the will as transcribed by the stenographer and took it with him. About three weeks from that date, appellant, the beneficiary of the will, brought the will back to Harris' office and requested that he keep it. Mr. Harris complied by putting the will in his own lockbox in the Greenville bank. The will is undated, but signed by deceased and two witnesses, namely, Paul Mathews and J. W. Birdsong, officers of the Greenville bank. The affidavit of one of these attesting witnesses, Mathews, was before the court. It stated that he and Birdsong signed the will at the request of deceased, that the will was either signed in their presence or was signed before it was presented to them for their signatures. Mathews does not remember the date of the signature. This subscribing witness also states that in his opinion deceased was a person of sound mind when he attested the will. So, also, Harris, who prepared the will, testified that the deceased was, in his opinion, of sound mind when he came to his office to have the will prepared.

Also in the record are three checks, each signed by the deceased; the first dated June 1, 1953, which transferred $50,000 from deceased's checking account to his savings account. This check was written presumably by some officer of the bank, but was signed by J. W. Smith and the words "Caddo Mills" were written by Smith. The second check dated June 25, 1953, was to an insurance agency for the sum of $67.25, signed by J. W. Smith in his own handwriting and the words "Caddo Mills" are also on the check in Smith's handwriting. The last of the three checks was dated June 26, 1953, and was for $75, payable to J. W. Farr and was written and signed by J. W. Smith. These three transactions occurred the month before, two of them the latter part of that month, before the will was executed. The witness to whom the $75 check

was given testified that it was for some bulldozer work done by him on Smith's farm. There is evidence by witnesses for appellant to the effect that deceased came to his farm on several occasions while they were working, looked over the crops, checked the tractors; discussed with them the operation of same, and also examined and discussed with them the operation of mechanical cotton-pickers; and on one occasion expressed his preference respecting the different mechanical cotton-pickers. All 16 witnesses, except the tax collector, testified from their observation of deceased before he executed the will, some time shortly before he executed the will, at the time the will was prepared and when it was signed by the witnesses, that deceased was of sound mind. We think it is undisputed in this record that during the greater part of the year 1953 deceased attended to his business, on many occasions drove his pick-up truck to his farm and to Greenville. Moreover, there is no hint in this record that any of deceased's relatives or any one else ever made application for or secured letters of guardianship for deceased during this period.

Both physicians who attended J. W. Smith while a patient at Phillips Clinic at Greenville from March 6, 1954, until the date of his death, November 30, 1954, testified that during the first portion of his stay in the clinic he possessed his mental faculties and knew the business he was about. He was of sound mind during that portion of his stay. Dr. Phillips testified further that J. W. Smith knew him every time he was in to see him until the last two days of his life. He also testified that he saw J. W. Smith sign papers a couple of times for a renter with respect to "some cotton allotments, or something with reference to a number of acres he was to plant in cotton." "Q. Did he attend to that business? A. Yes, sir." Both doctors at the clinic testified that during a great portion of the time J. W. Smith was at the clinic he was able to call for what he wanted and could recognize people who came to see him. There is evidence in the record, further, to the effect that J. W. Smith on the day he left Baylor

Hospital, November 4, 1952, was carried to his voting box in Hunt County where he voted and was then carried back to Dallas. It is in the evidence, further, that J. W. Smith collected rent from his tenant during the fall of 1953 and sold a tractor and equipment sometime after January 1, 1954.

The above is a summary of the testimony in this case, with respect to the only issue, the mental capacity of J. W. Smith at the time he executed his will as well as before and after its execution.

█ It seems to be a general rule that in cases of this character

"* * * the state of mind of the testator at the time of the execution of the will must be made the test of sanity, and the state of mind at other times can have no probative force, except as it may tend to show the state of mind of the testator at the time of execution of the will. By the proof introduced by appellant a prima facie case for probate of the will was made out, and unless that case was destroyed by the evidence introduced by the contestants, the will should have been probated." Navarro v. Garcia, Tex.Civ. App., 172 S.W. 723, 724. Griffin v. Griffin, Tex.Civ.App., 271 S.W.2d 714, by this court.

██ In weighing the evidence in this case we must be governed by the above rule and the further rule that:

"The owner of property has the absolute right to dispose of his property as he may desire, and the fact that the disposition of the property was not made to a blood relative, but to one not related by blood or marriage to the maker of the will, would not, standing alone, be sufficient to justify a refusal to probate the will. While the fact that the relatives were disinherited in favor of some one not related might be a circumstance, which, taken with others, might show unsoundness of mind or undue influence, yet, standing alone, it could not justify a verdict against the probate of the will. 'Wills are not to be probated solely upon the ground that the disposition which a testator may make of his property seems to a court or jury a natural and proper disposition, nor are they to be refused probate because to the court or jury the disposition of the property may seem to be improper or unnatural.' Vance v. Upson, 66 Tex. 476, 1 S.W. 179." Navarro v. Garcia, supra. See also Cruz v. Prado (In re Hernandez Estate), Tex.Civ.App., 239 S.W.2d 650.

We must observe the above rules in disposing of this case. And we must bear in mind also that J. W. Smith, the deceased, had a right to dispose of his property as he saw fit just the same as if a disposition had been made by deed.

As said in Salinas v. Garcia, Tex.Civ. App., 135 S.W. 588, 591:

" 'The power of disposing of property is an inestimable privilege of the old. It frequently commands attention and respect when other motives have ceased to influence. How often, without it, would the hoary head be neglected, deserted, and despised.' (Sloan v. Maxwell, 3 N.J.Eq. 563.) It is indeed a sad commentary upon humanity that when filial love has failed, and gratitude and devotion has passed away, the fear and awe inspired by the power of testamentary disposition of property becomes the 'shadow of a rock in a weary land,' and will insure the greatest respect and most devoted attention. Except in extreme cases of imbecility, the aged and decrepit should not be deprived of this last defense against ingratitude and base neglect."

In McIntosh v. Moore, 22 Tex.Civ.App. 22, 53 S.W. 611, 615, it is said:

"There is no presumption against a will, because made by a man advanced in age: * * * Incapacity cannot be inferred from enfeebled condition of mind or body; for, if incapacity could be inferred from such facts, a man by mere inference might be deprived of his legal right to dispose of his property as he sees fit."

The books are full of cases holding that " 'Courts are fond of sustaining wills' " but "juries seize an opportunity to break wills, never doubting their ability better to decide what should be done with a man's property than the man himself could do." Huffnagle v. Pauley, 219 S.W. 373, 378.

■ "It is the rule ordinarily that less mental capacity is required to enable a testator to make a will than for the same person to make a contract." Rudersdorf v. Bowers, Tex.Civ.App., 112 S.W.2d 784, 789, citing Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Vance v. Upson, supra; Payne v. Chance, Tex.Civ.App., 4 S.W.2d 328. It has also been held in this state: "Where it is shown that the execution of the writing was supervised by a lawyer, much probative force attaches to his opinion that the instrument expresses the wishes of the decedent." 44 Tex.Jur. p. 601, Sec. 59.

In McCannon v. McCannon, Tex.Civ. App., 2 S.W.2d 942, 944, it is said:

"It must be kept in mind that the issue is, not whether the testator was, at the time of executing the will, of 'sound mind,' as that term is generally understood in its broadest sense, but whether or not he was capable at such time of understanding that he was making his will, the nature and extent of his property, the objects of his bounty and the disposition he was making of his property. Imperfect memory, caused by sickness or old age, forgetfulness of the names of persons a testator has known, idle questions or statements, or requiring a repetition of information, will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to understand the act he was performing, the property he possessed, the disposition he was making thereof, and the persons or objects of his bounty, as said in Von De Veld v. Judy, 143 Mo. 348, 44 S.W. 1117: 'The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself of making the will. That I look upon as the thing to be first examined, and if it can be proved and established that it is a rational act, rationally done, the whole case is proved. What can you do more to establish the act? * * * Here is a rational act, rationally done. In my apprehension, where you are able completely to establish that, the law does not require you to go further.' "

■ The decision of every case of this character must rest upon the particular facts developed therein. The cases cited above set out the general rules with respect to the testamentary capacity of a testator. Bearing this in mind, we have reached the conclusion that the testimony of this record taken as a whole reveals that the verdict of the jury is so against the great weight and preponderance of the evidence as to be manifestly unjust. The facts are overwhelming that during the summer of 1953, including July 11th, the date the will was prepared, the testator was an astute businessman capable of attending to his property and the business connected therewith. As heretofore pointed out, attorney G. C. Harris of Greenville prepared the will for the testator, J. W. Smith, at Smith's suggestion and in Smith's presence Harris dictated the will to his stenographer. Smith came back the same day and got the will, after Harris had read it to him and after testator read it. Harris' unqualified testimony is to the effect that at the time he prepared the will and delivered it to the testator, in his opinion, Smith was of sound mind. One of the witnesses to the will also testified that in his opinion the testator was of sound mind when the witness attested the will some days after its preparation.

Having reached the conclusion expressed above that the verdict of the jury is so clearly against the great weight and preponderance of the evidence in this case as to be manifestly wrong, it is our opinion that the judgment of the trial court should be reversed and the cause remanded, and it is so ordered.

Reversed and remanded.