J. O. BURK, Jr., et al., Appellants,

v.

Rumalda MATA, Individually and as Independent Executrix of the Estate of Victoria Clark, Deceased, Appellee.

No. 15410.

Court of Civil Appeals of Texas, San Antonio.

Oct. 22, 1975.

Rehearing Denied Nov. 19, 1975.

Frank D. Masters, San Antonio, John L. Hill, Atty. Gen., David M. Kendall, Richard E. Green, Asst. Attys. Gen., Austin, for appellants.

Kenneth Oden, Perkins, Davis, Oden & Warburton, Alice, for appellee.

KLINGEMAN, Justice.

This is a will contest. The probate court of Jim Wells County, on June 14, 1972, admitted to probate a will of Victoria Clark, dated November 8, 1971, in which will appellee, Rumalda Mata, was the sole devisee and the independent executrix of such will. Appellants thereafter filed a contest to such probated will in the district court of Jim Wells County, asserting lack of testamentary capacity and undue influence as grounds for such contest. One of the contestants, Markel Heath, also filed an application to probate a prior will of Victoria Clark dated August 29, 1962, and a codicil thereto dated April 2, 1963; and the other contestants, J. O. Burk, Jr., the Salvation Army, and the Attorney General of Texas, joined in the application to probate this will. Trial was to the court without a jury. The trial court denied such contest and held that the former probate should not be set aside but should be confirmed; and the application to probate the will dated August 29, 1962, and codicil thereto was also denied. The trial court made extensive findings of fact and conclusions of law.[1]

Appellants assert on this appeal that: (1) the trial court erred in holding that the

---

1. The pertinent portions of such findings of fact and conclusions of law here involved may be summarized as follows:

(1) Victoria Clark, at the time of signing, making and publishing her last will dated November 8, 1971, was of sound and disposing mind and memory.

(2) Victoria Clark, at the time of signing the last will and testament dated November 8, 1971: (a) knew and had sufficient mental ability to understand and knew the effect of her act in making such will; (b) knew and had sufficient mental ability to understand the general nature and extent of her property; (c) knew and had sufficient mental ability to know her next of kin and natural objects of her bounty; (d) had sufficient memory to collect in her mind the elements of the business to be transacted and to hold them long enough to perceive their obvious relation to each other and to be able to form a reasonable judgment as to them.

(3) The last will of Victoria Clark dated November 8, 1971, is natural in its terms and provisions and provides for a natural disposition of the estate of Victoria Clark.

As a conclusion of law, the trial court found that at the time of executing the will dated November 8, 1971, Victoria Clark had testamentary capacity to make a valid will.

The trial court made findings with regard to execution of the will and undue influence, finding that the will was executed with the formalities and solemnities required by law; that no undue influence existed or was exerted upon Victoria Clark; and that such will was not procured by nor was it the result of undue influence. However, appel-

decedent had testamentary capacity because the only credible evidence establishes that the testatrix did not have testamentary capacity; (2) the findings of fact and conclusions of law pertaining to testamentary capacity are (a) supported by no evidence, (b) supported by factually insufficient evidence; and (c) against the great weight and preponderance of the evidence; (3) appellee, in an admission against interest, recognized and admitted that Victoria Clark did not have testamentary capacity at the time she executed the will; (4) the trial court erred in not admitting into evidence (a) the cause of death shown on the death certificate, (b) certain testimony of Mrs. C. E. Guinn contained in a deposition; (5) the trial court erred in admitting into evidence the testimony of Mrs. Flora Mae Pollard regarding her conversations with, observations of, and transactions with Victoria Clark because such testimony was in violation of the Texas Dead Man's Statute.

Victoria Clark died in Jim Wells County, Texas, on May 16, 1972. At the time of her death, at the time of executing the will, and for a period of time before the execution of such will, Victoria Clark was a patient at Premont Nursing Home. The will here under attack is a typewritten will dated November 8, 1971, signed by Victoria Clark and witnessed by Mrs. D. L. Pollard (Flora Mae) and Mrs. C. E. Guinn. It contains a self-proof certificate, signed and sworn to by the testatrix and the two attesting witnesses, before Hector Barrera, a notary public in and for Jim Wells County, Texas. At the time of executing this will, Mrs. Clark was 96 years of age. Appellee, Rumalda Mata, is the sole devisee in such will and is the independent executrix appointed in such will.

The will offered for probate by the contestants is dated August 29, 1962, with a codicil thereto dated April 2, 1963. Markel Heath, Esq., was the independent executor appointed under such will. In such will,

Victoria Clark made specific bequests to various named persons, including Rumalda Mata. Such will further contains a devise of her undivided one-half interest in a tract of 492.3 acres in Bexar County, Texas, to contestant J. O. Burk, Jr., recited to be her excellent friend and careful tenant. Her nephew, Walter A. Klein, is devised all of the oil, gas, and other minerals in two lots in the town site of La Gloria in Jim Wells County. All the test and residue of her property is devised to the Salvation Army. This will contains a provision that she deliberately does not make any bequests to any of her kin except for a nephew, Walter A. Klein. Walter A. Klein is not a contestant to the will dated November 8, 1971, and neither the appellee, Rumalda Mata, or any of the contestants are kin or related to Victoria Clark.

We first consider appellants' points of error asserting that the testatrix lacked testamentary capacity at the time of executing the will. In such points of error, appellants contend that the findings and judgment of the trial pertaining to testamentary capacity of the testatrix are supported by no evidence, factually insufficient evidence, and are against the great weight and preponderance of the evidence. We have carefully examined and considered all of the evidence.

■ Since this is a suit to annul the probate of a will already probated, the burden was on contestants to establish incapacity by a preponderance of the evidence. *Lee v. Lee,* 424 S.W.2d 609 (Tex.1968); *Chambers v. Winn,* 137 Tex. 444, 154 S.W.2d 454 (1941); *Duke v. Falk,* 463 S.W.2d 245 (Tex.Civ.App.—Austin 1971, no writ).

■ A person is generally deemed to have sufficient capacity to make a will, if, at the time of executing the will, he is aware of the objects of his bounty, if he understands the disposition made and the

lants make no contention on this appeal that such will was not executed with the formalities and solemnities required by law nor do they make any complaint on the matter of undue influence; and they have no points of error pertaining to these matters.

consequences of executing the instrument, and if he knows the nature and extent of his property. 61 Tex.Jur.2d Wills Section 20 (1964); *Oliver v. Williams,* 381 S.W.2d 703 (Tex.Civ.App.—Corpus Christi 1964, no writ); *McCannon v. McCannon,* 2 S.W.2d 942, 944 (Tex.Civ.App.—Galveston 1927, writ dism'd). Our Supreme Court in *Carr v. Radkey,* 393 S.W.2d 806, 813–14 (Tex. 1965), stated the question as follows: "The particular question here was whether Miss Hewlett, when she wrote her will, had sufficient ability to understand the business in which she was engaged, the effect of her acts in making the will, realized what she was doing, and knew the property she owned."

■ The proper inquiry in a will contest on the grounds of testamentary incapacity is the condition of the testator's mind on the day the will was executed. *Lee v. Lee, supra.*

The testimony with regard to testamentary capacity is sharply conflicting and contrasting. Nine witnesses testified on behalf of the proponent, including the two attesting witnesses and the notary who took the self-proof certificate. Five witnesses testified on behalf of contestants, including the attending physician. No useful purpose would be served by a recitation of all the lengthy evidence, pro and con, upon the issue, but the most pertinent portions therein are summarized in an appendix attached hereto.

■ Appellants' basic contention is that there is no credible evidence to support the trial court's findings as to testamentary capacity, and argues in effect that the testimony of proponent's witnesses is unbelievable. As a general rule, the trier of the facts is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Leyva v. Pacheco,* 163 Tex. 638,

358 S.W.2d 547 (1962); *Romer v. Gruver State Bank,* 474 S.W.2d 578 (Tex.Civ.App.— Eastland 1971, no writ). Appellant also argues that the only medical testimony establishes that Mrs. Clark did not have testamentary capacity, and that this should be controlling. This same contention was made in *In Re Finkelstein's Estate,* 61 S.W.2d 590 (Tex.Civ.App.—Amarillo 1933, writ dism'd), where four medical witnesses testified that the testator lacked testamentary capacity. Several lay witnesses testified to the contrary. The Court said: " 'But a physician's opinion regarding mental capacity generally, or the mental capacity necessary to make a will, is, in the eye of the law, no better than that of any other person.' " In *Schmidt v. Schmidt,* 403 S.W.2d 531 (Tex.Civ.App.—Waco 1966, no writ), the testator was 94 years old, sick, and in bed when he executed the will. The two attesting witnesses testified that the will was signed on February 10, 1964, between 12:00 and 3:00 in the afternoon, and that the testator had testamentary capacity. A medical doctor testified that he made a house call on the testator on such day in the afternoon between 12:00 and 2:30; that the testator was sick and unconscious at such time and was not able to recognize his relatives or know the nature and extent of his property; that he did not have sufficient memory to collect in his mind the necessary elements to make a will or form a reasonable judgment. The jury found that he had testamentary capacity at the time of making the will, and the appellate court upheld this finding.

■ Appellant also implies that because of Mrs. Clark's advanced age she could not have testamentary capacity. The fact that a testator is of an advanced age alone is not sufficient to deny probate of a will. *McCannon v. McCannon, supra.*[2] See

2. "It must be kept in mind that the issue is, not whether the testator was, at the time of executing the will, of 'sound mind,' as that term is generally understood in its broadest sense, but whether or not he was capable at

such time of understanding that he was making his will, the nature and extent of his property, the objects of his bounty, and the disposition he was making of his property. Imperfect memory, caused by sickness or

*Schmidt v. Schmidt, supra; Prince v. Johnston,* 352 S.W.2d 864 (Tex.Civ.App.—San Antonio 1961, writ dism'd); *Salinas v. Garcia,* 135 S.W. 588 (Tex.Civ.App.1911, writ ref'd).

 The testimony as to testamentary capacity is sharply conflicting and disputed, and, in our opinion, under the record before us, the testimony is sufficient to support either an affirmative or negative finding upon the issue of mental capacity. However, the trier of the facts heard the witnesses and had the opportunity to observe their appearance and demeanor; to weigh their testimony, and to evaluate the respective qualifications of all the witnesses. There is an abundance of evidence that testator had testamentary capacity, and also an abundance that she did not. The trial court saw fit to accept the former and reject the latter. This Court cannot substitute its opinion as to the credibility of the witness and the weight to be given the testimony for that of the trial judge. The rule is well established in this state that an appellate court will not disturb findings of a jury on conflicting evidence where there is some evidence to support their verdict, unless the verdict is so overwhelmingly against it as to shock the conscience or show clearly that the conclusion reached was wrong, or was the result of some passion, prejudice, or improper motive. *Highsmith v. Tyler State Bank & Trust Company,* 194 S.W.2d 142 (Tex.Civ.App.—Texarkana 1946, writ ref'd). The trial court's findings and judgment pertaining to testamentary capacity of Victoria Clark are not against the great weight and preponderance of the evidence and is sufficiently supported by the evidence.

 Appellants also contend that the finding of testamentary capacity should not stand because appellee, Rumalda Mata, in an admission against interest, recognized and admitted that Victoria Clark did not have testamentary capacity at the time she executed the will. This supposed admission is based on testimony by one of contestants' witnesses, Christine Clarke, that Rumalda Mata told her "all we want you to come in and say, you and Mr. Clarke, is that Mrs. Clark was of sound mind and that she had all her factions (sic) to the very last"; that although Mrs. Mata was present in the courtroom when such testimony was made, she never took the stand and denied the testimony. We regard appellants' contention as wholly without merit. The statement is clearly not an admission that Mrs. Clark did not have testamentary capacity and, if anything, it is consistent with appellee's contention that Mrs. Clark did have testamentary capacity. At most, it is an effort by appellee to locate witnesses who were favorable to her contention. We do not regard it as an admission in any respect nor do we regard it as relevant on the matter of testamentary capacity.[3]

 Appellants also contend that the court erred in not admitting into evidence the cause of death shown on the death

---

old age, forgetfulness of the names of persons a testator has known, idle questions or statements, or requiring a repetition of information, will not be sufficient to establish incompetency, if he had sufficient intelligence remaining to understand the act he was performing, the property he possessed, the disposition he was making thereof, and the persons or objects of his bounty . . . ." *McCannon v. McCannon,* 2 S.W.2d 942, 944 (Tex.Civ.App.—Galveston 1927, writ dism'd).

**3.** More in the nature of an admission is the written lease agreement between Mrs. Clark and J. O. Burk, Jr., one of contestants, admitted into evidence, dated October 30, 1971, less than 10 days prior to the execution of the will by Mrs. Clark. This instrument is a contract of lease signed both by Mrs. Clark and Burk covering a tract of land in Bexar County. It has been held that less mental capacity is required to enable a testator to make a will than for him to make a contract. *Smith v. Welch,* 285 S.W.2d 823 (Tex.Civ.App.—Texarkana 1955, writ ref'd n. r. e.); *Rudersdorf v. Bowers,* 112 S.W.2d 784 (Tex.Civ.App.—Galveston 1938, writ dism'd). It would appear that Mr. Burk recognized and acknowledged that Mrs. Clark had capacity to enter into a contract at the time such lease contract was executed.

certificate of Victoria Clark. The death certificate in question is signed by Dr. H. R. Buck and the cause of death is listed to be "generalized arteriosclerosis." Appellee asserts that the exclusion was proper because (a) the certificate did not comply with Article 4477, Tex.Rev.Civ.Stat.Ann. (1966), or other applicable statutes relating thereto, (b) the statement was hearsay.[4] They further assert that such point is not preserved because there is no objection to such exclusion. Even if we assume the exclusion was improper, it was not harmful error. Rule 434, Tex.R.Civ.P. (1967). Dr. Buck was one of contestants' witnesses and testified in detail about Mrs. Clark's physical and mental condition. He testified that she had arteriosclerosis and had advanced hardening of the arteries and testified in considerable detail as to the effect of arteriosclerosis. No reversible error is shown. See, generally, 4 Tex.Jur.2d App. & Err. Section 854 (1974); *Duncan v. Smith*, 393 S.W.2d 798 (Tex.1965); *Pittman v. Baladez*, 158 Tex. 372, 312 S.W.2d 210 (1958); *Missouri Pacific Ry. Co. v. Harkins*, 346 S.W.2d 910 (Tex.Civ.App.—Eastland 1961, writ ref'd n. r. e.); Rule 434, *supra*.

■ Appellants also complain that the trial court erred in admitting into evidence the testimony of Flora Mae Pollard regarding her conversations with, observations of, and transactions with Victoria Clark, because said testimony was in violation of the Texas Dead Man's Statute.[5] Mrs. Pollard was not a party to the suit here involved, she was not an heir or a legal representative of the decedent, or any other parties involved. The sole basis for appellant's contention is that since Mrs. Clark was a patient in the nursing home owned by Mrs. Pollard, that Mrs. Pollard might have a possible claim against the estate of Mrs. Clark, and that she was an interested party. There is nothing whatsoever in the record to show that she had any such claim. Assuming she had a claim, although there is no basis for such assumption, Mrs. Pollard's claim would in no way be affected whether or not the will here involved was probated. In *Morris v. Ratliff*, 291 S.W.2d 418 (Tex. Civ.App.—Dallas 1956, writ ref'd n. r. e.), the contention was made that one of the medical bill was for appellee to be success- the Dead Man's Statute (Article 3716) because he was an interested party in that he admitted that his sole chance to be paid his medical bill was for appellee to be succfessful in cancelling appellant's deed. The court said: "In our opinion the witness was not disqualified under the statute. It has been held that an attorney whose fee was contingent upon the outcome of a lawsuit is not disqualified as an interested party. . . . Certainly a doctor whose bill is not contingent, but whose chance to collect might depend on, or at least might become better with the success of one party in litigation, is not an interested party in the statutory sense." See also *Logan v. Thomason*, 199 S.W.2d 210 (Tex.Civ.App.—Fort Worth 1946), *rev'd on other grounds*, 146 Tex. 37, 202 S.W.2d 212 (Tex.1947); *Davidson v. Gray*, 97 S.W.2d 488 (Tex.Civ.App.— Eastland 1936, no writ). Mrs. Pollard was not a named party to the suit and did not have any legal interest in the suit. She was not a party within the purview of the Dead Man's Statute, and her testimony was not prohibited under the Dead Man's Statute.

4. *Armstrong v. Employers Casualty Co.*, 357 S.W.2d 168 (Tex.Civ.App.—Waco 1962, no writ); *Washington National Ins. Co. v. Chavez*, 106 S.W.2d 751 (Tex.Civ.App.—El Paso 1937, writ dism'd); *Universal Life & Accident Ins. Co. v. Ledezma*, 61 S.W.2d 165 (Tex.Civ.App.—Beaumont 1933, writ dism'd); Tex.Rev.Civ.Stat.Ann. Article 4477 (1966) and Article 3731a (Supp.1975).

5. Article 3716, Tex.Rev.Civ.Stat.Ann. (1926): "In actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the others as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this article shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent."

Appellants also complain that the trial court erred in excluding portions of the testimony of Mrs. C. E. Guinn. The gist of such excluded testimony is that, at the time she witnessed the will, she knew very little about geriatric patients, but that since such time, she had learned more about geriatric patients and had now had more experience; that based upon what she now knows, she would have some qualifications about Mrs. Clark's testamentary capacity; that based on what she now knows, she would not have witnessed a will without asking more questions; that she would ask for them to find a lawyer, and would ask the opinion of a doctor, and she would have it in writing before she did anything; that, in fact, she would not sign as a witness for any patient in any nursing home ever again. She further stated that one of the symptoms of geriatric patients is a senility and a forgetfulness; and that, based upon what she has since learned through training, internship and reflection, while she would not say that Mrs. Clark was incompetent, she would say that she was senile. On further questioning, she stated that she thought Mrs. Clark knew what she was doing at such time.

■ Appellee contends that her testimony was properly excluded because the matters sought to be testified by her were deductions, reasonings and conclusions based on other facts, experiences and training received after the event in question occurred.[6] Assuming arguendo that such testimony was improperly excluded, such exclusion was not reversible error. It is to be remembered that Mrs. Guinn testified in considerable detail about the execution of the will and Mrs. Clark's testamentary capacity at the time of the execution of the will. The testimony admitted is summarized in the attached appendix. In such admitted testimony, she testified that Mrs. Clark was of sound and disposing mind; that it never occurred to her that Mrs. Clark was of unsound mind; that, at such time, Mrs. Clark was perfectly rational;

and that there was no question in her mind that Mrs. Clark knew what she was doing and was doing what she intended to do. The trier of the facts, looking at all the testimony of Mrs. Guinn, admitted and excluded, could conclude that Mrs. Clark had testamentary capacity at the time of executing such will. Moreover, over and above any testimony of Mrs. Guinn, there was sufficient other testimony before the court to support an affirmative finding as to testamentary capacity, including the only other two persons who were present at the time of executing the will, which testimony was corroborated by various nurses who were working at the Premont Nursing Home at and before the execution of the will and who observed Mrs. Clark frequently.

All of appellant's points of error have been considered and all are overruled. The judgment of the trial court is affirmed.

## APPENDIX

### WITNESSES FOR CONTESTANTS

Dr. H. R. Buck testified that Victoria Clark first became a patient in about 1962. He was a witness to the will of August, 1962, and he testified in some detail about such will; testifying that Mrs. Clark definitely was in possession of all her mental faculties at that time, and that, considering her age (she was approximately 87 at that time), she was remarkably agile. During the next nine years, he saw her approximately four times. He testified that she gradually became more feeble, and that in June, 1971, when she was brought to his office she was in a condition of such debility that it was obvious that she was going to have to be taken care of, and that he sent her to a hospital in Falfurias, where she stayed about three weeks. He then sent her to Premont Nursing Home; his testimony being that she did not want to go but he ordered her admitted; that she was inconti-

---

**6.** See *Oakes v. Prather*, 81 S.W. 557 (Tex. Civ.App.—1904, writ ref'd); 2 McCormick and Ray, Texas Law of Evidence, Section 1398 (1956).

nent of urine and bowels and had to be helped to feed herself and to keep clean; that her eyesight was poor and her hearing poor, and that she had a big sore on her face and a tumor of the lung. He testified that she had arteriosclerosis, and had advanced hardening of the arteries; that Victoria Clark was senile at the time she was sent to the nursing home. He testified that in his opinion, Victoria Clark, during the time she was in the nursing home, was not capable of ordinary business judgments or of making rational decisions, that he did not believe she had lucid moments sufficient to making rational decisions; that in his opinion, on November 8, 1971, Victoria Clark did not know the nature and extent of her property, did not know who her relatives were, and did not know the effect of signing a will.

On cross-examination, he stated that Mrs. Clark was not ambulatory at the time she was brought into his office in June of 1971 and was never ambulatory thereafter; that he visited the rest home on an average of about twice a month; that he does not think, at any time Mrs. Clark was in the nursing home, she had the ability to know she was in a nursing home; that she did not know the members of her family, but that she knew Mrs. Mata; that she had lost her sense of esthetic discrimination; that he would not think Mrs. Clark would have any desire to keep clean or to have her hair taken care of; that she would not have sufficient emotional functions to grieve or to weep in grieving. He testified that while Mrs. Clark was in the nursing home, she was often drawn up into a fetal position; that he doubted whether Mrs. Clark, while in the nursing home, would be able to use the buzzer signal or cord to call a nurse and would not be knowledgable about the *foods that* were served to her.

Mrs. Phyllis Fine was the administrator of the nursing home at the time Victoria Clark was admitted to it. She testified that she admitted Mrs. Clark to such nursing home in July of 1971, and Mrs. Clark was ambulatory at that time, and on admission walked into the nursing home and she did not become bedridden until sometime later. She testified that she obtained all the necessary admittance information from Mrs. Clark, including her age, place of residence, nearest of kin, name of her deceased husband, name of her father; and that Mrs. Clark gave the name of Walter Klein, a nephew, as the person to be notified in case of emergency. She testified that upon admission, Mrs. Clark was very coherent and gave all the necessary information that she needed. She testified that, at the time of her admission, Mrs. Clark was in full possession of her faculties. She testified that, after Mrs. Clark was admitted to the hospital, she did not have too much opportunity to visit in her room, but saw her on occasion; that she considered Mrs. Clark as senile; that most of their patients are senile. She stated she was very neat and wanted to stay clean and that she had a mind of her own. She testified that, up until shortly before her death, Mrs. Clark would use the bedpan herself. She testified that Mrs. Mata visited Mrs. Clark nearly every day and would help feed Mrs. Clark and was faithful to her.

Miss Corin Almaraz, an LVN, worked for the Premont Nursing Home from sometime in 1968 to September, 1972; she knew Mrs. Clark and had frequent opportunity to observe her. She stated that Mrs. Clark was incontinent of both bowels and bladder; that she had a bad sore on her face, could not see very well, and was hard of hearing; that Mrs. Clark would sometimes pick at things which were not there and constantly folded napkins; that she frequently called out "Good Lord, let me die"; that she was not able to carry on a normal conversation, but that she knew who she was and where she was. She stated that she doubted that Mrs. Clark, while in the nursing home, would have been able to use the signal cord or buzzer to call the nurse; that she never turned herself under her own power. She testified that on occasion Mrs. Clark would ask if her nephew called. She also testified

that Mrs. Clark's position in bed was sort of like an infant's position and was a fetal position.

Mrs. Christine Clarke, who is no relation to Victoria Clark, operated an apartment or courts once known as Isham Courts, which was close to the nursing home. Mrs. Victoria Clark had a room in such courts prior to her admittance to the Premont Nursing Home and had lived there for a number of years, and even continued to pay rent on such apartment while she was in the nursing home. Mrs. Christine Clarke purchased such courts in about the year 1967, and Mrs. Victoria Clark was residing there at such time. She testified that at the time she was operating such courts, Mrs. Victoria Clark had various physical ills, but that she had a very strong will and carried on an intelligent conversation; that she listened to the radio regularly; was a baseball fan, liked to listen to the baseball games, and knew the names of the teams and players; that Mrs. Clark paid a monthly rent, by check which was signed by her, and that even after Mrs. Clark went to the nursing home, she continued to receive such checks which she accepted, endorsed and continued to cash. She testified that after Mrs. Clark went to the Premont Nursing Home, she visited her three times, but was uncertain as to the dates; that she believed that the last visit was in February or March of 1972; that on the first and second visits when she went to the nursing home, she noticed a change in her; that she did not talk about baseball anymore, was bedridden all the time and did not have very much to say; that her visits with Mrs. Clark at the nursing home were very short, usually about thirty minutes.

She testified that, after Rumalda Mata's son was killed in an accident, she went to visit Mrs. Clark in the nursing home, and Mrs. Clark was very upset about the accident. She stated that Mrs. Clark was very opposed to religion and politics and on one occasion said she wanted to be cremated. On cross-examination, she testified that Mrs. Clark was very opposed to nursing homes; that Mrs. Clark was an independent type of woman and knew what she wanted; that she continued to drive an automobile until about 1970 (in 1970, she was 95 years old) and took excellent care of the automobile; that her conversations were intelligent. She testified that on one of her three visits to the nursing home, Mrs. Clark was grieving the death of Mrs. Mata's son; that on her visits to Mrs. Clark, she was always on her back in a normal position and on occasion Mrs. Clark would turn herself.

The only other witness for contestant was Mr. W. V. Isham, Jr. He testified that he knew Victoria Clark during her lifetime, first meeting her about 1960; that she lived at Isham Courts in Premont, which were owned and operated by his father until his death, and after his death, by himself. He was a witness to the 1962 will of Mrs. Clark and most of his testimony is confined to proving up such will. He testified that Mrs. Clark had testamentary capacity at that time. He further testified that in 1967, when he was operating Isham Courts, Mrs. Clark's condition was substantially unchanged from that of 1962, but that he never visited her in the nursing home.

### WITNESSES FOR PROPONENTS

Mrs. D. L. Pollard (Flora Mae) was one of the attesting witnesses to the will of Victoria Clark, dated November 8, 1971. She is the owner and operator of the Premont Nursing Home and was such owner and operator of such nursing home from the time Mrs. Clark was admitted into such nursing home in July of 1971, until after her death. She testified that she was an LVN and on occasion acted as administrator of such nursing home. She had known Mrs. Clark since 1960. She stated that Mrs. Clark always liked Mrs. Rumalda Mata, and that Mrs. Mata would do things for Mrs. Clark and was always very attentive to her. Mrs. Pollard testified that at the time Mrs. Clark was admitted to the nursing home, she was placed in a room with a Mrs. West, who was the mother of Mrs. G. E. Guinn, the other attesting witness to the will; that

while Mrs. Clark was in the nursing home, she looked in and visited with her on many occasions; that she frequently talked to her and Mrs. Clark would ask questions which were coherent.

She stated that Mrs. Clark was very sick in the early part of November, 1971, about November 2nd or 3rd, and had severe respiratory problems; that on one of such nights Mrs. Clark told her, "This is my deathbed wish—in case I don't live through the night, will you see that Rumalda Mata gets everything that is mine?" She testified that the next day, Mrs. Clark asked her to call Hector Barrera and, after Mrs. Clark had asked her a second time, she called Mr. Barrera and told him that Mrs. Clark wanted him to come to the nursing home. She testified in some detail with regard to the execution of the will, and in connection therewith, testified that Mr. Barrera, Mrs. Guinn, and herself were present; that Mr. Barrera read the will in its entirety to them, speaking loudly and he then asked Mrs. Clark if that was the way she wanted it, and Mrs. Clark said it was. Mrs. Clark then signed the will and then she and Mrs. Guinn signed it as witnesses. She testified that, in her opinion, at such time, Mrs. Clark had the ability to understand the will and was of sound mind. She stated after the will was signed and witnessed, Mrs. Clark thanked Mrs. Guinn and herself for coming in to witness the will. She testified that Mrs. Clark was strong minded and nobody could influence her; that one time she had mentioned that she had a tract of land in Bexar County, which was leased by Mr. Burk; and that she knew her nephew, Mr. Klein. With regard to her physical condition, Mrs. Pollard testified that Mrs. Clark was able to call for help from the nurses by using the signal light buzzer cord on her bed and she did so on numerous occasions; that on such occasions, she would tell whoever answered the buzzer what she wanted; that she had her likes and dislikes and would say what nurses she did not like; that she could get

on the bedpan herself; that she liked to keep clean; that she could sit up on the side of her bed up until a short time before she died; that she liked to sit in the chair to eat on occasion and did so.

Mrs. Priscella Coots, an LVN, testified that she knew Mrs. Clark for more than 20 years and had many occasions to visit her; that she frequently visited her at Isham Courts and had occasion to see her in Premont Nursing Home in July of 1971; that Mrs. Clark recognized her, and she and her husband talked with Mrs. Clark; that, in her books, Mrs. Clark was competent, and that she knew what she was talking about; that Mrs. Clark and Rumalda Mata were friends over a long period of time and Mrs. Clark frequently spoke of her; that she had heard Mrs. Clark talk about a farm she had in Bexar County which she called Rocky Mountain Farm and that she said that the property was leased. She also testified that on her visit to Mrs. Clark at the nursing home, Mrs. Clark could hear them perfectly when they talked normally to her, that Mrs. Clark was just as spicy as ever and seemed to be the same Victoria Clark she knew all the years.

Mrs. G. E. Guinn was one of the witnesses to the will. She testified that she knew Mrs. Clark only after Mrs. Clark became a patient at Premont Nursing Home and that Mrs. Clark was in the same room with her mother, Mrs. West;[1] that she visited her mother every day and would see Mrs. Clark at such time and talked to her every day; that Mrs. Clark was sick and bedridden, was hard of hearing, and could not see well, but that she was a very independent old lady; that she was able to communicate with Mrs. Clark until about the last six weeks before she died; that Mrs. Clark would talk to her as long as she could, and it was rational speaking; that she was very impressed by Mrs. Clark's conversation and was surprised at her intelligence; that Mrs. Clark was a very fastidious person and concerned about

---

1. She testified that her mother, Mrs. West, was unable to communicate or carry on conversations while she was at the rest home.

keeping herself clean; that she was very independent. She stated that Rumalda Mata would visit frequently and would help feed her; that Mrs. Mata was very faithful to Mrs. Clark and Mrs. Clark told her that she appreciated Rumalda.

Mrs. Guinn testified in some detail as to the execution of the will. She said that she was working in the office at the nursing home when Mrs. Pollard came in and asked her if she would witness Mrs. Clark's will; that she went to Mrs. Clark's room and Mrs. Pollard was the other witness. Mr. Barrera was in the room and said that he had the will Mrs. Clark had requested; that Mrs. Clark had requested that it was her desire to have a will drawn up leaving everything to Rumalda; that Mr. Barrera then read the will to Mrs. Clark in the presence of all of them; that Mrs. Clark was sitting up and there was a bedside table on the bed which was usually put on the bed to eat; Mr. Barrera was looking directly at Mrs. Clark when he read the will and was probably two or three feet away; when Mr. Barrera finished reading the will, he asked Mrs. Clark if this was her desire and she said that it was; that Mrs. Clark signed the will at the little table and then she and Mrs. Pollard signed it; and that the self-proof certificate was signed before Mr. Barrera, the notary. When asked whether it was her testimony that at that time and circumstances she thought Mrs. Clark was of sound & disposing mind, she testified "Well, yes." She also testified that it never occurred to her that Mrs. Clark was of unsound mind; that when Mr. Barrera read the will, he did so in a voice that could be heard by Mrs. Clark; that there was no question in her mind that she understood it; that, at such time, she was not under sedation; that she was perfectly rational; that there was no question in her mind that Mrs. Clark knew what she was doing and was doing what she intended to do.

Mrs. Guinn further testified that there was a strong bond of affection between Mrs. Clark and Rumalda Mata; that Rumalda Mata was a kind, cooperative, loving individual and, in the last years of Mrs. Clark's life, she was the only friend that she had.[2]

Mrs. Kathleen Pyle was an LVN who worked at Premont Nursing Home. She testified that she first met Victoria Clark when she came to the nursing home; that, at different times, she worked on different shifts and saw her on all of such shifts and saw her regularly until she died; that Mrs. Clark always knew her when she went into the room and called her "Miss Pyle"; that she had numerous conversations with her; that Mrs. Clark would signal for her by use of the signal cord on her bed; that she would sometimes ask for medication; that she was able to sit on the side of her bed when she ate and this continued until shortly before her death; that she was able to turn herself in bed from side to side; that she could take her pills straight; and that she insisted on staying clean.

Miss Mary Lopez was a nursing aide who worked at Premont Nursing Home for nine years. She testified that part of her duties was to attend to Victoria Clark; that Mrs. Clark was able to operate the signal pull on the light whenever she needed something; that when she answered the calls, Mrs. Clark would tell her what she wanted her to do; that she never had any trouble communicating with Mrs. Clark; that Mrs. Clark had strong likes and dislikes and wanted to keep her clothes clean; that when Mrs. Clark was asked questions, she would respond normally; that Mrs. Clark did not cry, scream or holler; that Mrs. Clark was a determined, strong-willed woman until shortly before her death and that Mrs. Clark was not childish.

Mrs. Braulia Quintanilla testified that she was working as a nurses aide at Premont Nursing Home in July of 1971 at the time

2. The testimony of Mrs. Guinn herein summarized does not include that portion of her testimony which was excluded by the court, which is the subject of another point of error and such testimony will be discussed under such point of error.

Mrs. Clark was admitted to the nursing home and until after Mrs. Clark's death; that she worked the seven to three morning shift; that she would see Mrs. Clark several times every shift. She testified that Mrs. Clark could turn in her bed until shortly before her death; that she never saw her in a fetal position; that she could sit up on the side of the bed to eat; that if she wanted a certain type of food, she would ask for it; that Mrs. Clark could ring for a nurse and that when she answered, Mrs. Clark would tell her what she wanted; that she had no trouble communicating with Mrs. Clark; that Mrs. Clark always wanted to be very clean and that she was able to use her bedpan alone; that Mrs. Clark had a strong will of her own.

Mr. Hector Barrera was the notary when he took the oath on the self-proof certificate to the will of Mrs. Clark, dated November 8, 1971. He testified that he had been Justice of the Peace of Precinct No. 4 in Jim Wells County for twenty years and had known Victoria Clark for 18 or 20 years. He stated that Mrs. Pollard called him to come to the nursing home to see Mrs. Clark and as a result of such phone call, he went to the nursing home that day, and went to Mrs. Clark's room; that when he entered the room, Mrs. Clark recognized him, greeted him and shook hands with him; that they chatted for about ten minutes and Mrs. Clark then asked him to prepare a will for her; that he told her that he was not authorized to prepare wills and that it had to be prepared by an attorney. Mrs. Clark then asked him if he would recommend one, and he said he would be glad to; that Mrs. Clark then told him that she wanted a will prepared and she wanted to leave everything to Mrs. Rumalda Mata; that he told her he would take care of it and subsequently called Mr. Warburton in Alice and told Mr. Warburton that Mrs. Clark desired to have a will prepared, leaving everything to Rumalda Mata; that, as a result of such conversation, he was delivered the instrument identified as Plaintiff's Exhibit No. 21, which is the will of November 8, 1971; that it was brought to him in a sealed envelope; that he opened it and it contained the prepared will, a copy, and a bill. He stated that on this same day he took the will to the nursing home to Mrs. Clark's room; that Mrs. Clark was sitting on the side of the bed and when she saw that he had an envelope in his hands, she asked him if that was the will she had requested to be prepared; that he told her it was; and that she would have to get two witnesses. She told him she would like to get Mrs. Guinn and Mrs. Pollard as witnesses. He testified that the will was read to her; that she listened attentively and that he asked her if that was what she wanted and she said, "That is exactly the way I want it." He testified that Mrs. Guinn was present during the time he read the will, but that he thought that Mrs. Pollard came in towards the end of the reading; that Mrs. Clark signed the will on a little hospital table and the two attesting witnesses, Mrs. Pollard and Mrs. Guinn, then signed it; that he then proceeded to take the self-proof certificate, which he read and notarized.

Barrera testified, based on his observations of and conversations with Mrs. Clark that, at the time of signing of the will, Mrs. Clark was (a) capable of understanding the nature of the document that she signed, (b) capable of knowing and understanding the effect of signing the will leaving her property to Mrs. Mata, and (c) capable of knowing the general nature and extent of her property. He further stated that her mind was as sound as the day he met her.

Mr. W. M. Jackson testified that, at and before the death of Mrs. Clark, he was an assistant trust officer and vice-president of the Alice National Bank; that the Alice National Bank was the trustee under a trust instrument executed by Mrs. Alice Kempshall, a sister of Victoria Clark. Such trust instrument was introduced into evidence as an exhibit and one of the properties therein covered is an undivided one-half interest in a tract of 492.3 acres in Bexar County, Texas, (the other one-half interest

was owned by Victoria Clark). In such trust, Mrs. Kempshall is the primary beneficiary, and upon her death Victoria Clark is the successor beneficiary, for and during her natural life. He testified that he knew J. O. Burk, Jr., who is one of the contestants. He said that Mr. Burk brought a lease agreement to the Alice National Bank and presented it to him, and represented to him that it was a lease agreement Victoria Clark had signed and indicated her signature on such instrument. This lease agreement was introduced into evidence. It is dated October 30, 1971, and is a lease agreement on the 486 acre tract in Bexar County. It is purportedly signed by Victoria Clark and bears the signature "Victoria Clark." This lease agreement contains the signature of J. O. Burk, Jr., under a line which states "Accepted and Approved this the first day of November, 1971."

Mr. Lawrence Warburton, Esq., testified that on various occasions in the past the firm of which he is a member had represented Victoria Clark, and that Mr. Jake Floyd of such firm had prepared two previous wills for Mrs. Clark, one in 1946 and one in 1953. Copies of these wills were introduced into evidence.